The State, *ex rel.* Holt *et al.*, *v.* Denny, Mayor, *et al.*

No. 14,836.

THE STATE, EX REL. HOLT ET AL., *v.* DENNY, MAYOR, ET AL.

CONSTITUTIONAL LAW.—*Authentication of Act.—Passage Over Veto.*—Where a bill, which has been passed by both houses of the General Assembly and duly signed by the presiding officers thereof, is vetoed by the Governor, and afterwards reconsidered by the General Assembly and passed over the Governor's objections, in accordance with section 14 of article 5 of the Constitution, it becomes a law without being attested a second time by the presiding officers.

SAME.—*Legislative Journals.—Evidence of Passage of Act.*—The journals of the two houses of the General Assembly, upon which the Governor's objections to a bill are required to be entered, and which show the passage of the bill notwithstanding such objections, are public records, to which the court may look, and are proper evidence of the passage of the bill over the veto.

SAME.—*Municipal Corporations.—Local Self-Government.—Appointment to Office.—Power of Legislature.*—The right of local self-government in towns and cities was not surrendered upon the adoption of the Constitution, but is still vested in the people of the respective municipalities, and the Legislature can not appoint officers to administer municipal affairs, its power ending with the enactment of laws prescribing the manner of selection and the duties of the officers.

SAME.—*Fire Department.—Local Control.—Legislative Interference.*—The right to provide and maintain a fire department in towns and cities is vested in the inhabitants of the respective municipalities, as an element of local self-government, and is not subject to legislative interference, except in so far as the General Assembly may prescribe rules to aid the people in the exercise of such right.

SAME.—*Police and Fire Act of March 7th, 1889.—Invalidity of.*—The act of March 7th, 1889 (Acts of 1889, p. 222), creating a board of metropolitan police and fire department in cities having a certain population, providing for the election of the first commissioners by the Legislature, and giving them exclusive control of the police and fire departments of such cities and of matters connected therewith, is void, in so far as it relates to the fire department, as being in violation of the right of local self-government; and as the provisions of the act in relation to the police department are so connected with and dependent upon its other provisions as to be practically inseparable, the whole act falls.

The State, *ex rel.* Holt *et al., v.* D  ny, Mayor, *et al.*

SAME.—*Special Privileges and Immunities.--    ht to Hold Office.— Residence and Political Tests.*—The provision in the aᴄᴛ of March 7th, 1889, *supra,* that the commissioners of the police and fire departments therein provided for shall have resided in the city for which they are elected for five years next preceding their election, and that the members of the police and° fire forces to be organized under said act shall be chosen equally from the two leading political parties of the city, is in violation of section 23 of article 1 of the Constitution, which prohibits the granting of special privileges or immunities.
Mitchell, J., dissents.

From the Marion Superior Court.

*J. S. Duncan* and *C. W. Smith,* for appellants.

*L. T. Michener,* Attorney General, *W. L. Taylor, A. C. Harris, W. H. Calkins, F. Winter, R. O. Hawkins, C. F. Griffin* and *J. H. Gillett,* for appellees.

OLDS, J.—This is a proceeding to test the right of the board of metropolitan police and fire department of the city of Indianapolis, elected by the General Assembly of the State of Indiana, March 9th, 1889, under the provisions of enrolled act No. 83, House of Representatives, to the possession, custody and control of the station-house, city prison, patrol wagon, books, records and equipments belonging to the police department of said city ; also, the possession, custody and control of all engine-houses, engines, ladders, hose-reels, horses, wagons, books, records, and all the equipments and property of every description belonging to the fire department of said city, and to determine the right of the said board of metropolitan police and fire department of the city of Indianapolis to discharge the duties of their office as defined and prescribed by said enrolled act No. 83.

The questions presented by these proceedings relate to and involve the validity of said act.

The first question presented is, whether the act involved has been properly certified so that the courts can take judicial knowledge of it as a law?

The second question challenges the authority of the General Assembly to enact a law of like scope, tenor and effect

to the one in question, and requires an adjudication as to its constitutionality and validity.

The law in question provides that in all cities of this State of twenty-nine thousand or more inhabitants, according to the United States census of 1880, there shall be established within and for such cities a board of metropolitan police and fire department, to consist of three commissioners. The members of the first board or boards, under the act, shall be elected by the General Assembly upon the taking effect of the act, one of whom shall be of opposite politics to the other two, one to serve until January 1st, 1893, one until January 1st, 1892, and one until January 1st, 1891, their successors and succeeding members to be appointed by the mayor of said cities, and the terms of those thus appointed shall be three years ; that the said commissioners shall have resided in such cities for at least five years next preceding their election ; that, before entering upon their duties, they shall take an oath of office before the clerk, and a further oath that in any appointment or removal to be by them made to or from the police force or fire department created and to be organized by them under the act, they will in no case, and under no pretext, appoint or remove any policeman or officer of police, or fireman or officer of the fire department, because of any political opinion held by any such person, or for any other cause or reason than fitness or unfitness of such person. The commissioners are required to give bond, and shall each receive a salary of $600 per annum, payable monthly out of the city treasury. They shall elect one of their number to act as president, who shall be *ex officio* a member of the board of health of such city. They shall elect some person not a member of the board to act as secretary and property clerk, who shall give bond, and receive a salary not exceeding fifteen hundred dollars per annum. The said board shall have power to select a superintendent of police, captains, sergeants, detectives, and such other officers and patrolmen as the board may deem advisable, said captains, sergeants, detectives, and

other officers and patrolmen to be selected equally between the two leading political parties of said cities. Said board shall not have power to appoint more than one patrolman for each ten hundred inhabitants of said city, except in cases of emergency. The officers and patrolmen shall receive such compensation as the board shall determine—the superintendent not less than one nor more than two thousand dollars per annum; captain not less than seven nor more than twelve hundred dollars; sergeant not less than six nor more than ten hundred dollars; patrolmen not less than five hundred and fifty nor more than eight hundred dollars; and the salaries of other officers to be fixed by the board. All members of the force shall be able to speak the English language. The board shall have power to remove or suspend any member of the force, and provide rules of discipline, and to make and promulgate general and special orders through the superintendent, who shall be the executive head of the force. Said commissioners shall, immediately after their organization, assume and exercise the entire control of the police force and fire department of such city, and shall possess full and exclusive power and authority over the police organization, government, appointments and discipline within the city. They shall have the custody and control of all public property, including station-houses and city prisons, patrol wagons, books, records, and equipments belonging to the police department; all engine-houses, engines, ladders, hose-reels, horses, wagons, books, records, and all equipments and property of every description belonging to the fire department of such city. The act abolishes all other police and fire boards, and officers and forces maintained under any other law, and makes them unlawful.

The act further provides that said board shall immediately assume and exercise the entire control of the fire department of such city, and appoint a chief fire engineer at a salary not exceeding $2,000; appoint firemen and all necessary employees of the fire department and fix their compensation,

said firemen and employees to be selected equally from the two leading political parties of said city.

It is provided in detail that the board shall have exclusive control and management of the police and fire departments of such cities, and made the duty of the board of aldermen and common council of such city as shall have two boards, and of the common council of such as has but one board, to provide, at the expense of such city, all necessary accommodations within the city limits for station-houses, engine-houses, hook and ladder-houses, to furnish, warm and light the same, provide food for prisoners detained in the station-houses—in short, to provide everything necessary for the departments, and to pay all the expenses of maintaining the departments of police and fire.

It is further made unlawful, and punishable by fine and dismissal from the service, for any member of the police force or fire department, while on duty, to solicit any person to vote at any general or special election for any candidate for office, or to challenge any voter, or in any manner attempt to influence any elector at such election, or to be a delegate or candidate to any political convention, or to solicit votes for any candidate from any delegate to any such convention. There is an emergency clause. The bill is signed by the president of the Senate and speaker of the House and attested by the clerk of the House. There is also a certificate of the clerk of the House and secretary of the Senate. The certificate of the clerk of the House sets forth the fact that the bill was, on the 7th day of March, 1889, returned to the House with the objections of the Governor, and that the objections were spread upon the journal and the bill again passed, by a vote of 54 ayes and 39 nays; and the certificate of the secretary of the Senate certifies that upon the bill having passed the House, notwithstanding the Governor's objections thereto, the same was transmitted to the Senate, and it was then ordered that the Governor's objections be spread in full upon the journal, which was done, and the bill passed, not-

withstanding the objections of the Governor thereto, by a vote of ayes 27, nays 19.

It is urged that the act is not properly certified so that the courts will take judicial knowledge of it as a law. It is contended by counsel for appellees that to entitle it to the solemnity and force of a law, after it was vetoed by the Governor and passed by both houses of the General Assembly, it must be again attested by the presiding officers of the two houses, as required by section 25, article 4, on its orig-. inal passage. That unless it be so attested, courts will not take cognizance of it as a law. That courts can only look to the bill itself, and not to the journals of the two houses of the General Assembly, to determine whether or not the bill was passed over the objections of the Governor.

Section 14, article 5, provides: "Every bill which shall have passed the General Assembly shall be presented to the Governor; if he approve, he shall sign it, but if not, he shall return it, with his objections, to the house in which it shall have originated, which house shall enter the objections, at large, upon its journals, and proceed to reconsider the bill. If, after such reconsideration, a majority of all the members elected to that house shall agree to pass the bill, it shall be sent, with the Governor's objections, to the other house, by which it shall likewise be reconsidered; and if approved by a majority of all the members elected to that house, it shall be a law." It will be seen by this section that no attestation by the presiding officers is required, but it expressly declares "it shall be a law." It seems to us clear that the Constitution does not require an attestation of the bill a second time, or after it has been passed over the objections of the Governor, and that section 25, article 4, has no relation to the passage of a bill after it has been vetoed. It is held in the case of *Evans* v. *Browne*, 30 Ind. 514, that the courts must, for themselves, ascertain what is the public law of the State, and that the courts can not look beyond the enrolled act and its authentication to determine the validity of an act.

The act under consideration by the court in that case was properly certified and had not been vetoed, but became a law without executive approval. The decision of the court was, that when an act appeared regular upon its face, and properly certified by the presiding officers and found with the proper custodian, the courts would not look to the journals to determine whether or not, at the time the bill was voted upon and passed, there was a quorum present in each house, and whether all the provisions of the Constitution had been complied with in its enactment; that, in such a case as was then before the court, the attestation of the presiding officers was conclusive evidence of the regularity of the proceedings in both houses of the General Assembly in the passage of the act; that the Constitution declared the mode by which such bill should be certified, and such certificate was conclusive as to the regularity of its enactment and could not be contradicted by the journals.

By section 12, article 4, it is declared that " Each house shall keep a journal of its proceedings, and publish the same. The yeas and nays, on any question, shall, at the request of any two members, be entered, together with the names of the members demanding the same, on the journal."

In the case of *Evans* v. *Browne, supra,* the court says : " The enrolled acts, with their authentication, are deposited in a public office, and are there accessible to everybody. The journals are public documents, at least, if not records ; and are also within reach of all. Whatever, affecting the question of a quorum, such as the resignation of members, may have been lodged with the Governor, may also be inspected. In short, every fact upon which, in any view, depends the question whether a document purporting to be a statute has, by legislative action, been invested with the force of law, is, in its nature, a public fact which may be easily ascertained ; it is a fact of public current history, and there is therefore no necessity for bringing it to judicial knowledge by the finding of an issue."

This discussion by the court in that case is in harmony with our views.

In the case of the passage of bills notwithstanding the objections of the Governor, the Constitution does not require the attestation of the same by the presiding officers of the two houses of the General Assembly. Nor does it require any attestation or certificate by any officer, but expressly declares that " it shall become a law."

The journals of the two houses upon which the objections of the Governor are required to be entered at large, and showing the passage of the bill notwithstanding the Governor's objections, are public records, to which the court may look, and are proper evidence of the passage of a bill after the same has been returned with the objections of the Governor, and if a bill is so passed it becomes a law. If the Constitution required an attestation by the presiding officers after its passage over the Governor's objections, as it does in case of the original passage of bills before presentation to the Governor, then such certificates would be the proper and conclusive evidence of the passage ; but, as we have stated, vetoed bills are not required to be so certified, and there is no record or evidence of such passage required to be kept, except the journals of the two houses. The cases of *Evans* v. *Browne, supra, Board,* etc., v. *Burford,* 93 Ind. 383, and authorities cited in support of the same, are not in conflict with the principle we have announced. The acts under consideration in those cases were not vetoed, and were properly certified and placed in the proper depository, and the court refused to go behind the proper attestation by the signatures of the speaker of the House and president of the Senate, and institute an investigation to ascertain whether or not all constitutional requirements had been complied with in the passage of the acts and in the presentation of the same to the Governor.

In this case it is conceded that the bill was passed as required by the Constitution, but it is contended that it must

be attested by the presiding officers after such passage, in or-
der to become a law and to be recognized by the courts as a
law. We do not think this objection well taken.

We next consider whether or not the act and its provisions
are within the scope of legislative authority under the Con-
stitution of the State.

It is contended by counsel for appellants that, by the Con-
stitution of the State, all power is vested in the legislative
department of the government, except such as is expressly
granted to the executive and the judiciary, or retained by
the people, in the Constitution itself. We are not in harmony
with counsel's theory of our State government, but we state
it this way.

At the adoption of the State Constitution all power was
vested in the people of the State. The people still retain all
power, except such as they expressly delegated to the several
departments of the State government by the adoption of the
Constitution. The legislative, executive and judicial depart-
ments of the State have only such powers as are granted to
them by the Constitution. In the first section and first article
of the Constitution it is declared " that all power is inherent
in the people." It is contended by counsel that as certain rights
were granted and certain other rights reserved by the people,
therefore all rights were granted, except such as were
expressly reserved. The peculiarity of the theory is, that
while the people, by the Constitution, made grants of power
to three different departments of government, it is contended
that all power that was at that time in the grantor, the peo-
ple, passed to one branch of the government, viz., the po-
litical or legislative branch, and that it took all power not
mentioned in the instrument, and the executive and judi-
ciary took only such as was expressly granted to them, and
the people retained such only as was specifically named and
reserved. It is certainly a novel method of construction,
and contrary to all the rules for construing contracts, deeds,
wills and other written instruments, and it seems to us that

the proposition need but to be stated to prove its fallacy. In construing and giving an interpretation to the Constitution, we must take into consideration the situation as it existed at the time of its adoption, the fact expressed in the instrument that all power is inherent in the people, the rights and powers vested in and then exercised by the people, the existence of cities and towns and the right of local self-government exercised by them, and the laws in force and form of government existing at the time of its adoption.

One of the fundamental principles of municipal corporations is the right of local self-government, including the right to choose local officers to administer the affairs of the municipality. 1 Dillon Munic. Corp. (3d ed.), section 11, states the law as follows: "To civil territorial divisions, erected into corporations with defined powers of local administration, and the extension of the right to vote for officers, to all who are to be affected by their action, are due that familiarity with public affairs and that love of liberty and regard for private rights and property, which are characteristic of the best government in Europe, Great Britain, and the best in America, the United States." Section 183: "The fundamental idea of a municipal corporation proper, both in England and in this country, is to invest compact or dense populations with the power of local self-government." Justice BROWN, in the case of *People* v. *Draper,* 15 N. Y. 532, 561, says: "We learn from Blackstone, and the elementary writers, that the civil divisions of England, its counties, hundreds, tithings, or towns, date as far back as the times of the great Alfred. In all the changes of policy, of dynasty, of peace and internal war, and even of conquest, which that country has undergone since his day, these organizations have never been abated or abandoned. They are substantially at this time what they were before the Norman invasion. Wherever the Anglo-Saxon race have gone, wherever they have carried their language and laws, these communities, each with a local administration of its own se-

lection, have gone with them. It is here they have acquired the habits of subordination and obedience to the laws, of patient endurance, resolute purpose, and the knowledge of civil government, which distinguish them from every other people. Here have been the seats of modern civilization, the nurseries of public spirit, and the centers of constitutional liberty.. They are the opposites of those systems which collect all power at a common center, to be wielded by a common will, and to effect a given purpose; which absorb all political authority, exercise all its functions, distribute all its patronage, repress the public activity, stifle the public voice, and crush out the public liberty."

In the case of *People* v. *Albertson,* 55 N. Y. 50, the court says: "This right of self-government lies at the foundation of our institutions, and can not be disturbed or interfered with, even in respect to the smallest of the divisions into which the State is divided for governmental purposes, without weakening the entire foundation; and hence it is a right not only to be carefully guarded by every department of the government, but every infraction or evasion of it to be promptly met and condemned; especially by the courts, when such acts become the subject of judicial investigation."

We might quote from numerous other authorities to the same effect as the above, but we have quoted sufficient to show that the right of local self-government, including the right of the people of a municipality to select their own officers, was a sacred fundamental principle and idea of municipal corporations, well founded, sacredly guarded, and long enjoyed by the people of the State at the time of the adoption of the Constitution.

As we interpret the theory of our State government, this right of local self-government, vested in, exercised and enjoyed by, the people of the municipalities of the State at the time of the adoption of the Constitution, yet remains in them, unless expressly yielded up and granted to one of the branches of the State government by the Constitution. And

in the decision of the question presented in this case, it is only necessary to determine whether or not that power is granted to the legislative branch of the government, as it is only it which has attempted to deprive the people of cities of the right to choose their own officers and administer their local affairs. We will therefore look to the Constitution to determine what power is granted to that branch of the State government.

Section 1, article 3, is as follows: "The powers of the government are divided into three separate departments; the legislative, the executive, including the administrative, and the judicial; and no person charged with official duties under one of these departments shall exercise any of the functions of another, except as in this Constitution *expressly provided.*"

Section 1, article 4, declares: "The legislative authority of the State shall be vested in the General Assembly." Legislative authority is the power to make laws, alter and repeal them. Cooley Const. Lim., pp. 90, 91; *Hawkins* v. *Governor*, 1 Ark. 570 (591); *Greenough* v. *Greenough*, 11 Pa. St. 489; *Wayman* v. *Southard*, 10 Wheat. 1; *In re Canada R. W. Co.*, 7 Fed. Rep. 653. How were these sections understood by the framers of the Constitution?

Mr. Biddle, a member of that body, said: "The great fundamental idea in all the American constitutions is, that the powers of government shall forever be kept apart, and exercised separately. This is the basis of the Constitution of the United States, and of every separate State. No gentleman on this floor will deny this proposition. And I have often thought that we are indebted to that one principle more than to any other, or perhaps to all others, for the freedom we enjoy as Americans. We set out in our bill of rights by declaring that the powers of the government of Indiana shall be divided into three distinct departments, and each of them be confided to a separate magistracy. Those which are legislative to one; those which are judicial to another; and those

which are executive to a third. And no person being of one of these departments, shall exercise any power which properly belongs to another.

"Now, Mr. President, I desire briefly to examine these powers separately, and then their true relation to each other. We settled in the beginning that the legislative authority of this State shall be vested in the General Assembly, which shall consist in a Senate and House of Representatives. Let me remark in passing, that the Governor finds no place in this provision—the duties and powers of the executive are in no manner connected with it. Nor is there here any trace of judicial power. What is the legislative power? It is that power by and through which a State makes its laws. In a free country like our own, law is but the formal expression of the opinions, wants, desires, and wishes of the people. The people send up their representatives to make their laws in accordance with the will of their constituency. The Legislature is the mouth-piece of the State, by which it expresses its voice. The better to regulate this power, it is divided into two houses, each representing different divisions of a common constituency, and holding their offices by a different tenure as to time. This insures the true expression of the general voice, without regard to any particular time or locality. It also gives order and consistency to legislation. Each house is a check upon the other. The General Assembly has no other duty nor power, than to make laws. After a law has been enacted this department has no further power over the subject. It can neither adjudge the law, nor execute it, but must leave it upon the statute books, and for any function still remaining in the legislative power, there it would forever remain. All the power of this department here ends." 2 Const. Debates, 1323.

In the case of *De Chastellux* v. *Fairchild*, 15 Pa. St. 18 (53 Am. Dec. 570, 571), Gibson, C. J., in delivering the opinion, said: "The power of the Legislature is not judicial.

It is limited to the making of laws; not to the exposition or execution of them."

By the sections of the Constitution above quoted, it is clear there is no power granted to the legislative branch of the government except to make laws, and that the power conferred was properly defined by Judge Biddle, when he said: "The General Assembly has no other duty nor power, than to make laws. After a law has been enacted this department has no further power over the subject. It can neither adjudge the law, nor execute it, but must leave it upon the statute books, and for any function still remaining in the legislative power, there it would forever remain. All the power of this department here ends." This interpretation of legislative power by Judge Biddle in the constitutional convention was not challenged or denied.

It is manifest that the framers of the Constitution used, and the people in adopting it understood, the words "The legislative authority of the State shall be vested in the General Assembly," with a view of vesting in the General Assembly only the right to make laws, and did not by the use of these words intend to surrender the right of local self-government, and the right of choosing their own local officers and rulers, or to delegate such power to the General Assembly.

The word "town" is generic, comprehending cities, so held in the case of *Flinn* v. *State*, 24 Ind. 286. In 1 Blackst. Com., by Chitty, top pp. 81, 82, the word town is defined as follows: "The word *town* or *vill* is indeed, by the alteration of times and language, now become a generical term, comprehending under it the several species of cities, boroughs, and common towns."

The existence of towns and cities is recognized in the State Constitution.

Section 22, article 4, provides that no local or special law shall be passed "vacating roads, town plats, streets, alleys, and public squares."

Section 6, article 6. "All county, township, and town of-

ficers shall reside within their respective counties, townships, or towns; and shall keep their respective offices at such places therein, and perform such duties as may be prescribed by law."

Section 8, article 6. "All State, county, township, and town officers may be impeached, or removed from office, in such manner as may be prescribed by law."

Section 9, article 6. "Vacancies in county, township, and town offices shall be filled in such manner as may be prescribed by law."

Certainly, by none of the sections of article 6 do the people part with the right of local self-government, in so far as the choosing of their own county, township and town officers is concerned. Towns are classed alike with the other subdivisions of the State—counties and townships. If the people parted with the right to choose their city and town officers by either of these sections, they also parted with their right to select and choose their county and township officers. By section 6 it is made imperative on such officers to reside and keep their offices within their respective counties, townships and towns, and perform such duties as may be prescribed by law.

This section vests in the Legislature the right to prescribe the duties of such officers. Section 8 grants the right to the legislative department to prescribe the manner in which such officers may be impeached, and section 9 vests in the Legislature the power to prescribe the manner in which vacancies in county, township and town offices may be filled, but vesting in the legislative department the power to prescribe the manner of filling a vacancy does not vest the right to fill such vacancies. Prescribing the manner of filling an office is a legislative act. The law points out how and by whom an office or a vacancy in an office shall be filled, and the right to make laws is vested in the General Assembly. When the General Assembly has passed the law prescribing the manner of filling the vacancy, then the power vested in it as a

legislative body ends.   The power to execute the law rests elsewhere, unless it is expressly given to the legislative department.

It is declared by section 1, article 3, that the Legislature shall not exercise any functions except legislative, unless it is expressly so provided in the Constitution.   It is to be presumed that the words used in the Constitution were used in their ordinary sense, and in interpreting the language of the Constitution each word shall be given its well defined definition and meaning.   The word "express," as defined by Worcester, means: " Given in direct terms ; not implied ; not dubious; clear; definite; explicit; plain; manifest." The word " expressly " is defined by Worcester to mean: " In direct terms ; plainly."   Bouvier's law dictionary gives the definition of " express " as: " Stated or declared, as opposed to implied.   That which is made known and not left to implication."   " Expressly" is defined in the Encyclopædic Dictionary to mean: " In an express, clear or distinct manner ; plainly ; directly ; pointedly ; in direct terms." It certainly can not be contended that the power to elect or appoint county, township or town officers is given to the General Assembly in direct, definite, explicit, plain or manifest terms by any of the language used in either of the sections of article 6.   If it can be held that such power be granted at all, it must be by implication from the words " in such manner as may be prescribed by law," that is, the giving the Legislature power to prescribe the manner carries with it the power to do the act—to fill the office.   If such power could be fairly inferred or implied from the language used, yet it would not grant the power, for the reason that it is declared in section 1, article 3, that no implied power in excess of legislative shall be exercised, except such as is expressly, plainly, certainly or directly granted.

The Supreme Court of Ohio held, in the case of *State* v. *Kennon*, 7 Ohio St. 546, that the Constitution of Ohio, providing that " the directors of the penitentiary shall be ap-

pointed or elected in such manner as the General Assembly may direct," did not give to the General Assembly power to make the appointment of directors. In speaking of the right claimed by the Legislature to appoint, the court says: " To make good this claim, it must be made to appear that the power to direct the ' manner,' the mode, the way in which an act shall be done, and the power and authority to do the act itself, are one and the same thing. But that they are not identical, or equivalent to each other, is too clear for argument, and almost too clear to admit of illustration. To prescribe the manner of election or appointment to an office is an ordinary legislative function. To make an appointment to office, is an administrative function."

Under our system of government, divided into three separate, distinct, co-ordinate branches, the legislative and judicial departments may exercise appointing power to offices peculiarly related to and connected with the exercise of their constitutional functions, and to maintain their independent existence ; that is to say, the General Assembly may elect or appoint the officers of their respective branches and relating to their department of the government ; courts may appoint administrators, guardians, master commissioners and such officers as are necessary to the free and independent exercise of power conferred by the Constitution, but the appointment of officers generally is naturally and properly an executive function. *Taylor* v. *Com.*, 3 J. J. M. 401 ; *Letter of Thomas Jefferson to S. Kercheval*, dated November 21st, 1816 ; *Marbury* v. *Madison*, 1 Cranch, 137 ; *Wood* v. *U. S.*, 15 Ct. of Cl. 151 ; *Perkins* v. *U. S.*, 20 Ct. of Cl. 438 ; *U. S.* v. *Perkins*, 116 U. S. 483 ; *Ohio* v. *Covington*, 29 Ohio St. 102 ; *Achley's Case*, 4 Abb. Pr. Rep. 35 ; *State* v. *Kennon*, 7 Ohio St. 546 ; *People* v. *McKee*, 68 N. C. 429 ; *State* v. *Tate*, 68 N. C. 546 ; Pomeroy Const. Law, section 643 ; Federalist Letters, 47 and 48.

The only remaining provision which we think it can possibly be claimed granted any power to the General Assem-

bly to fill offices, is section 1, article 15, which provides: "All officers whose appointments are not otherwise provided for in this Constitution shall be chosen in such manner as now is, or hereafter may be, prescribed by law." This is the same language used in the section we have heretofore referred to. Town officers were at that time elected by the people of the respective towns of the State, in the exercise of the right of local self-government. As applied to town officers, the language used certainly can not be construed as an intention on the part of the people to surrender their right of local self-government, and as granting the power to the General Assembly to elect or appoint local officers in the various towns of the State. Indeed, to place any other construction than we have upon such language, and hold that the General Assembly has the right to appoint town officers for one or two cities or towns of the State, to take charge of and administer their local affairs, as it seeks to do by the act under consideration, would be granting to the General Assembly the power to elect every county, township and town officer not expressly named and the manner of their election pointed out by the Constitution.

Section 3, article 6, provides that " Such other county and township officers, as may be necessary, shall be elected or appointed in such manner as may be prescribed by law." We have not placed any new or forced construction on the Constitution, nor have we advanced any new or strange theory of our State government, but are adhering to the well recognized theory of our government, and walking in the same beaten path that all have walked since the adoption of the Constitution. Since its adoption, and before, the people of the counties, townships, cities and towns have exercised the exclusive right of selecting and choosing their local officers, the Legislature has recognized their right to do so, and prescribed the manner of election, and now for the first time the General Assembly has claimed to itself the power of selecting such officers for two cities of the State.

We have quoted and considered all the provisions of the Constitution granting power to the legislative department of the State government, and are clearly of the opinion that the Legislature is granted no such power as is exercised in the passage of this act, in providing for the election of and in electing the officers contemplated by the act; but, indeed, it is not earnestly contended by counsel that any such power is by express terms granted, but it is contended, as stated in the outset, that, by the creation of the departments of government by the Constitution, all power vested in the Legislature that was not, by express terms, reserved to the people or granted to the executive or judicial departments, and that the burden rests on him who asserts that a law is unconstitutional, to point out the provisions of the Constitution that forbid its passage.

Upon the question as to the constitutionality of statutes, Judge Cooley says: "It does not follow, however, that in every case the courts, before they can set aside a law as invalid, must be able to find in the Constitution some specific inhibition which has been disregarded, or some express command which has been disobeyed. Prohibitions are only important when they are in the nature of exceptions to a general grant of power; and if the authority to do an act has not been granted by the sovereign to its representative, it can not be necessary to prohibit its being done." Cooley Const. Lim. (5th ed.), p. 208.

In considering the question of the right of the Legislature of the State of Michigan to appoint municipal officers, the Supreme Court of Michigan, in the case of *People* v. *Hurlbut*, 24 Mich. 44, 96 (9 Am. Rep. 103), in an opinion written by that eminent jurist, Justice COOLEY says: "Our Constitution assumes the existence of counties and townships, and evidently contemplates that the State shall continue to be subdivided as ·it has hitherto been; but it nowhere expressly provides that every portion of the State shall have county or township organizations. It names certain officers

which are to be chosen for these subdivisions, and confers. upon the people the right to choose them; but it does not in general define their duties, nor in terms preclude the Legislature from establishing new offices, and giving to the incumbents the general management of municipal affairs. If, therefore, no restraints are imposed upon legislative discretion beyond those specifically stated, the township and county government of any portion of the State might be abolished,. and the people be subjected to the rule of commissions appointed at the capital. The people of such portion might thus be kept in a state of pupilage and dependence to any extent, and for any period of time the State might choose.. The doctrine that within any general grant of legislative power by the Constitution there can be found authority thus. to take from the people the management of their local concerns, and the choice, directly or indirectly, of their local of-. ficers, if practically asserted, would be somewhat startling to. our people, and would be likely to lead hereafter to a more careful scrutiny of the charters of government framed by them, lest sometime, by an inadvertent use of words, they might be found to have conferred upon some agency of their. own, the legal authority to take away their liberties altogether. If we look into the several State Constitutions to see what verbal restrictions have heretofore been placed upon legislative authority in this regard, we shall find them very few and simple. We have taken great pains to surround the life,. liberty, and property of the individual with guaranties, but we have not, as a general thing, guarded local government with similar protections. We must assume either an intention that the legislative control should be constant and absolute, or, on the other hand, that there are certain fundamental principles in our general framework of government, which are within the contemplation of the people when they agree upon the written charter, subject to which the delegations of authority to the several departments of government have been made. That this last is the case, appears to me too.

plain for serious controversy. The implied restrictions upon the power of the Legislature, as regards local government, though their limits may not be so plainly defined as express provisions might have made them, are nevertheless equally imperative in character, and whenever we find ourselves clearly within them, we have no alternative but to bow to their authority. The Constitution has been framed with these restrictions in view, and we should fall into the grossest absurdities if we undertook to construe that instrument on a critical examination of the terms employed, while shutting our eyes to all other considerations." *People* v. *Albertson,* 55 N. Y. 50; *People* v. *Mayor,* 51 Ill. 17; Cooley Const. Lim. (5th ed.) 208; *Id.,* 209, 282, 225; Pomeroy Const. Law (9th ed.), chapter on Centralization and Local Self-Government, section 151, *et seq.;* 1 Dillon Munic. Corp. (3d ed.), section 9.

The conclusion we unhesitatingly reach is, that the right of local self-government in towns and cities of this' State is vested in the people of the respective municipalities, and that the General Assembly has no right to appoint the officers to manage and administer municipal affairs; that the right of the General Assembly ends with the enactment of laws prescribing the manner of selection and the duties of the officers. There is a class of officers whose duties are general, but who act for the State in localities, which the General Assemblies of some States have exercised the right to appoint, and courts have upheld the right to make such appointments; but this class of officers are constabulary or peace officers, those whose duties are to preserve the peace. In this case we do not deem it necessary to consider that portion of the law relating to peace officers, or to determine the right of the General Assembly to appoint officers of that character under our Constitution. The right of the State, however, to exercise such power must rest on the theory that the State owes protection to its citizens wherever they may be within the borders of the State, alike upon highways in a sparsely

populated territory as upon the streets of a densely populated city, and to discharge such obligation has the right to exercise control over the peace officers of the State; but the law in question provides for taking exclusive control of the fire department within certain cities, appointing the officers and controlling the department, and compelling the cities to pay all of the expenses.   Although some authority may be found to support such right on the part of the Legislature, we think it is in conflict with our system of State government and derogatory to the rights of the people.

There are many things which are included within the definition of police power which are purely local, and of which the State has only an indirect interest, and which, under our State government, are exclusively within the control of local authorities.   Such we regard the fire department and the control of the streets, sidewalks, sewers and water-works of a city or town.   In speaking of such matters as are purely local, in the case of *People* v. *Hurlbut, supra,* Justice COOLEY says:   " In the case before us, the offices in question involve the custody, care, management and control of the pavements, sewers, water-works and public buildings of the city, and the duties are purely local.   The State at large may have an indirect interest in an intelligent, honest, upright and prompt discharge of them ; but this is on commercial and neighborhood grounds, rather than any political, and it is not much greater or more direct than if the State line excluded the city."

In New York, commissioners were appointed in 1876 to devise a plan for the government of cities in the State of New York.   In their report, they say of the assumption by the Legislature of the direct control of local affairs :   " This legislative intervention has necessarily involved a disregard of one of the most fundamental principles of republican government (the self-government of municipalities).   The representatives elected to the central (State) Legislature have not the requisite time to direct the local affairs of the mu-

nicipalities. They have not the requisite knowledge of details. When a local bill is under consideration in the Legislature, its care and explanation are left exclusively to the representatives of the locality to which it is applicable; and sometimes by express, more often by a tacit understanding, local bills are 'log-rolled' through the houses. Thus legislative duty is delegated to the local representatives, who, acting frequently in combination with the sinister elements of their constituency, shift the responsibility for wrong-doing from themselves to the Legislature. But what is even more important, the general representatives have not that sense of personal interest and personal responsibility to their constituents which are indispensable to the intelligent administration of local affairs. And yet the judgment of the local governing bodies in various parts of the State, and the wishes of their constituents, are liable to be overruled by the votes of legislators living at a distance of a hundred miles." 1 Bryce American Commonwealth, pp. 611, 612. In speaking of this committee and its report, Mr. Bryce says: "The commission, of which Mr. W. M. Evarts (now Senator from New York) was chairman, included some of the ablest men in the State, and its report, presented 6th March, 1877, may be said to have become classical." Vol. 1, p. 609.

The learned gentlemen composing that committee expressed their views as stated in the report, after having carefully studied the question with a view of devising the best plan of city government.

Is it fair to presume that the people of this State, in the adoption of the Constitution, did not intend to surrender the right of self-government in so far as to allow the Legislature to even take charge of the fire department of every town and city of the State, and to appoint officers to take charge of and manage the affairs of such department, and limit the legislative body to sixty-one days in every two years. We do not believe that such was the intention of the people at that time, nor do we believe that such is their understanding of the

power of the Legislature at the present time ; nor is there any word or sentence in the Constitution granting such power.

It is contended that the preservation of property against loss by fire clearly falls within the scope of the police power to be exercised by the State ; that the supreme power of destroying buildings to prevent the spreading of fires is one of the illustrations that city officers are not possessed of these powers, as city officers, but because they are, to that extent, State officers, with strictly State powers conferred on them.

Mr. Hare, in his American Constitutional Law, vol. 2, pp. 762, 763, states the law in regard to the right to tear down buildings to prevent the spread of a conflagration, as follows : " The acts which authorize sheriffs, magistrates, or other officers to destroy infected clothing or to tear down buildings in order to prevent the spread of a conflagration, rested on the inherent right of self-defence, and simply regulated a power which might be exercised on the ground of necessity though it were not conferred in terms."

" It is enough," said Comstock, J., in *Wynehamer* v. *People*, 13 N. Y. 378, " to say of such statutes, that they are founded upon and are mere regulations of the common law right of any person to destroy property in a case of immediate and overwhelming necessity to prevent the ravages of fire or pestilence. * * * Statutes of this description merely appoint a municipal agent to judge of the emergency, and direct the performance of acts which any individual might do at his peril without any statute at all." Hence one who acts in cases of the above description without being authorized thereto by a statute, and one who relies upon the authority of such a statute as a justification, stand upon the same basis.

In the case of *Wynehamer* v. *People, supra*, at p. 439, it was said by Selden, J.: " It is said that the Legislature has the conceded power to authorize the destruction of private property, in certain cases, for the protection of great public interests ; as, for instance, the blowing up of buildiings

during fires and the destroying of infected articles in times of pestilence, and that the Legislature is necessarily the sole judge of the public exigency which may call for the exercise of this power. The answer is, that the Legislature does not in these cases authorize the destruction of property; it simply regulates that inherent and inalienable right which exists in every individual to protect his life and his property from immediate destruction. This is a right which individuals do not surrender when they enter into the social state, and which can not be taken from them. The acts of the Legislature in such cases do not confer any right of destruction which would not exist independent of them, but they aim to introduce some method with the exercise of the right." See, also, *Russell* v. *Mayor*, etc., 2 Denio, 461.

The doctrine is well stated in the authorities above cited. The right is inherent in every individual to protect his own property from destruction by fire. We certainly think it can not be contended that, if the individual should provide himself with fire-engines and appliances for the extinguishment of fires and the suppression of conflagrations, and erect buildings for storing and keeping such appliances for the protection of his own property, the State, by its General Assembly, could appoint an agent to protect his property from destruction by fire and compel him to turn his appliances, thus provided, over to such agent, and require the individual to pay the expense of the service. What greater reason exists for declaring that the people of a municipality, who have collectively supplied themselves with such means of extinguishing fires and preventing conflagrations, at a large expense, shall turn such property over to officers selected by the General Assembly and pay the expense of keeping up a fire department in the selection of which they are not allowed to participate? The State has no interest in the property within a city or town, except such indirect interest as it has in the property of all its citizens.

Since the organization of the State government, towns and

cities have universally exercised the exclusive right of self-government in the control and repair of streets, alleys and sidewalks, in the construction of sewers and water-works, and in the organization and control of fire departments. They have been held liable for damages resulting by reason of defects in sidewalks, streets and sewers. All property within the corporate limits is liable for the payment of debts created by the municipality in providing these necessities for the people of the municipality, and in which the people, other than those residing within the particular town or city, are in no way directly interested. After the exercise of these rights for nearly thirty years, under the present Constitution, the General Assembly submitted to the people, and the people adopted, an amendment to the Constitution limiting the amount of indebtedness to be incurred by municipal corporations, expressly recognizing the right of local self-government by cities and towns to incur indebtedness in the management of their municipal affairs; and now, by this act, the Legislature of the State seeks to create a commission, composed of three persons appointed by it, to take charge of the police and fire departments of two cities, without the powers of said commissioners being limited in the employment of firemen or the incurring of liability to be paid by the city.

The General Assembly has no power except such as was granted by the Constitution. Judge Cooley, in his work on Constitutional Limitations (5th ed.), p. 47, says: " In considering State Constitutions we must not commit the mistake of supposing that, because individual rights are guarded and protected by them, they must also be considered as owing their origin to them. These instruments measure the powers of the rulers, but they do not measure the rights of the governed. ' What is a Constitution, and what are its objects? It is easier to tell what it is not than what it is. It is not the beginning of a community, nor the origin of private rights; it is not the fountain of law, nor the incipient state of government; it is not the cause, but consequence, of personal and

political freedom; it grants no rights to the people, but is the creature of their power, the instrument of their convenience. Designed for their protection in the enjoyment of the rights and powers which they possessed before the Constitution was made, it is but the framework of the political government, and necessarily based upon the pre-existing condition of the laws, rights, habits, and modes of thought.' " Again he says, on same page : " 'A written Constitution is in every instance a limitation upon the powers of government in the hands of agents; for there never was a written republican Constitution which delegated to functionaries all the latent powers which lie dormant in every nation, and are boundless in extent and incapable of definition.' "

We hold that the right to provide and maintain a fire department in a town or city is one of the rights which are vested in the people of municipalities, is to be exercised by them, and is not subject to legislative interference, except in so far as that body may prescribe rules to aid the people of the municipality in the exercise of such right; that such right is an element of local self-government which was vested in the people of the municipalities at the time of the adoption of the Constitution, and was not parted with by them ; that so much of the statute under consideration as relates to the management and control of the fire departments of cities, is unconstitutional and void.

Having reached the conclusion that the provisions of the statute relating to the management and control of the fire departments of cities by commissioners appointed by the General Assembly are invalid, the next question to be determined is, whether the provisions of the statute relating to the fire department and police department are so intermingled with and dependent on each other as that the whole law must fall ?

The rule for the determination of this question is, that if the provisions of the act are so mutually connected with and dependent on each other as conditions, considerations or

·compensations for each other as to warrant the belief that the Legislature intended them as a whole, and, if all could not be carried into effect, the Legislature would not have passed the residue independently, then, if some parts are un-·constitutional, all the provisions which are thus dependent, conditional or connected must fall with them. This is the rule universally held by the courts in determining the validity of a statute. *Myers* v. *Berlandi* (Minn.), 40 N. W. Rep. 513 ; *O'Brien* v. *Krenz*, 36 Minn. 136.

In the case of *Burkholtz* v. *State*, 16 Lea (Tenn.),·71, it is held : " When only a part of a statute is void, and the residue so dependent and connected with the void part that it ·can not be presumed that the Legislature would have passed the one without the other, then both are void."

In the statute in question the title to the act declares it to be "An act providing for a board of metropolitan police and fire department." The name given to the board is a " Board ·of Metropolitan Police and Fire Department." It gives the board like control of such department. It requires all the property, real and personal, belonging to such department, together with the books and records, to be turned over to such board. It gives the board full control, and imposes upon it the duty to immediately organize both departments. It gives the board like power to remove and appoint the force in both departments. It provides that such force shall be selected equally from the two leading political parties in such ·cities. The oath the commissioners take relates to their duties in both departments. It fixes a salary for each commissioner, to be paid to him monthly out of the treasury of such city, which is in payment for his services rendered in the discharge of his duties in relation to the fire department as well as the police department. It requires each of the commissioners to give a bond for the faithful discharge of his duties, which applies to the duties in both departments. They are to appoint a secretary and property clerk, who is to give a bond and receive all property belonging to both departments. It

requires a joint auditing of all the expenditures in both departments, to be certified to by the president and secretary of said board, and an appropriation by the city to pay the same monthly. In short, it is a joint act in relation to these two departments, and the only separation of one from the other is merely in the designation of officers and fixing their salaries, and use of terms which would apply to but one department.

In determining whether any part of this statute is valid, while the other is invalid, it is proper to consider other statutes and laws in force at the time of its passage, and the defects sought to be remedied and the purpose and object of its passage. In doing so, we find there is another statute upon the statute books of the State creating a metropolitan police board for the same cities to which this law applies, composed of three commissioners, which is in full force, and similar, indeed almost identical in terms, to the provisions of this act relating to the police department, except that the salary of the commissioners shall not exceed $400, and the salary of the secretary and property clerk shall not exceed $1,000. It is evident that the sole purpose and object of this enactment was to enable the State, by its legislative department, to take exclusive charge and control of the fire department of the cities within the provisions of this law, and to unite under the same management the constabulary or police force and the fire department. The services of the commissioners would be greater and the duties much more arduous in the management of both departments than only one, and it is evident that the General Assembly, in fixing the salary of the commissioners in this act, took into consideration the duties to be performed in both departments, and named an amount corresponding, in its judgment, to the whole duties to be performed by them. The provisions of this act, relating to these departments, being so intermingled, mutually connected with and dependent upon each other, and there being another statute of like tenor and effect gov-

erning the management of the police department, it is evident that the Legislature would not have passed the part of the act relating to the police department in the manner and with the provisions that it would contain if that portion relating to the fire department were stricken out, and that such law can not be enforced, as it was intended by the Legislature, with that part relating to the fire department eliminated therefrom. We, therefore, hold that the whole act must fall by reason of its being in opposition to the fundamental principles of our State government, and against the spirit of our Constitution, and that the Legislature had no power to pass such an enactment.

The act provides that said commissioners shall have resided in such cities for at least five years next preceding their election. It also provides that the captains, sergeants, detectives and other officers and patrolmen, and the firemen and employees of the fire department, shall be selected equally from the two leading political parties of said cities.

Section 23, article 1 of the Constitution provides: " The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens."

It was the evident intention of the Legislature that the provision as to the residence of the commissioners should apply to all the commissioners appointed at any time under the act. This is clearly in violation of the Constitution. If the Legislature can require a residence of five years as a qualification for office, it can require a residence of any other number of years; if it can make the fact of residence a qualification for office, it can make age a qualification, and may therefore fix the qualification for a statutory office above a certain age or under a certain age, or between certain ages. It is clearly class legislation, and granting to certain citizens privileges not equally belonging to all.

Section 8 of the act provides: " The officers and members of such metropolitan police force shall possess all the com-

mon law and statutory powers of constables, except for the service of process." And section 9 gives to them exclusive power to serve process issued from certain courts within the city, and they are, by virtue of such act, public officers, as are the commissioners provided for by said act, and the provision of the law limiting the right to hold such police offices to persons belonging to one of the two leading political parties within such cities is invalid, as it grants to a class of citizens belonging to two leading parties privileges and immunities, viz., the right to hold such police offices, that it does not confer on all citizens. In other words, it exacts of a citizen that he believe in a certain political faith or creed to entitle him to hold such offices. If the right to hold such offices can be limited to persons belonging to, and identified with, either one of two parties, it can be limited to persons belonging to one party, which would exclude more than one-half of the voters of such cities from acting as police officers. The existence of various political parties and the manner in which officers are selected, are matters of which courts take judicial knowledge. The right to hold public office is a right which belongs alike to every voter residing within the political division of the State from which such officer is chosen, unless otherwise provided by the Constitution.

It is suggested that we have many other laws which require a residence or property qualification to enable the person to occupy certain positions and perform certain duties, such as the law providing that if a voter be challenged a resident freeholder of the precinct must make an affidavit to procure the challenged voter the right to vote; the divorce act, requiring the residence to be proven by two freeholders; that jury commissioners and judges of elections must be freeholders.

None of these are public officers, in a strict sense, and the question as to the validity of such laws differs very materially from the one under consideration. The Legislature has the right to prescribe what shall be competent evidence

The State, *ex rel.* Holt *et al., v.* Denny, Mayor, *et al.*

to establish particular facts, and, in the case of judges of elections, they are mere temporary agents, selected in a particular way, to guard and protect the purity of the ballot; and the law prescribing the mode of selecting jurors is to aid courts in guarding the sanctity of the jury-box. Such persons do not exercise rights and privileges to which every person is entitled, and are not strictly officers, but agencies used by the officers whom the people have selected to carry out the will of the people. The Legislature having the right to pass laws governing elections and the manner of selecting juries, it has the right to prescribe proper safe-guards for the execution of the same.

Having held that the provisions of the act relating to the fire and police departments are so interwoven, connected with and dependent upon each other that the whole act must fall, it is not necessary to determine whether the provisions of the act relating to the selection and the qualifications of the officers would invalidate the whole act.

In reaching the conclusion we have as to the unconstitutionality of this act, we have not been unmindful of the rule governing courts in passing upon the constitutionality of a statute. This prerogative should not be exercised by courts in doubtful cases, but when an act is plainly in violation of the fundamental principles of government and the spirit of the Constitution, and seeks to take from the people the inherent and inalienable rights vested in them, and to deprive them of local self-government, courts should not hesitate to declare such a law invalid.

We therefore hold that the entire statute is unconstitutional and void, and that there is no error in the record for which the judgment should be reversed.

Judgment affirmed, with costs.

MITCHELL, J., dissents, for the reasons given in his opinion in the case of *State, ex rel., v. Denny, ante,* pp. 382, 411.

Filed April 24, 1889.