## *In re* WORTMAN.

(*Supreme Court, Special Term, Erie County.* July 31, 1888.)

1. OFFICE AND OFFICER — APPOINTMENT — CIVIL SERVICE LAWS — HONORABLY DISCHARGED SOLDIER.

Under Buffalo city charter, tit. 2, § 50, authorizing the street commissioner to appoint street inspectors, and naming them as city officers, a street inspector is within the New York civil service laws declaring that preference shall be given to honorably discharged soldiers of the civil war who are not incapacitated.

2. SAME—CONSTITUTIONAL LAW.

Laws N. Y. 1884, c. 410, § 4, providing that honorably discharged soldiers of the civil war shall be preferred for appointment in the civil service of the state and of the cities, is not violative of Const. N. Y. art. 12, § 1, declaring that no other oath, declaration, or test shall be required as a qualification for office than that contained in this constitution.

3. SAME—RIGHTS AND IMMUNITIES.

Nor does it violate Const. U. S. amend. 14, § 1, prohibiting a state to pass any law abridging the privileges or immunities of citizens, or to deprive any one of life, liberty, or property without due process of law.

4. SAME—MANDAMUS—PETITION.

A petition for *mandamus* to the city council to appoint to office an honorably discharged soldier of the civil war, under the civil service law, is fatally defective in not averring that the council knew that he was an honorably discharged soldier.

Application by Samuel W. Wortman for a *mandamus* to the common council of the city of Buffalo to appoint the applicant to the office of street inspector.

*Leroy Andrus* and *A. C. Calkins*, for applicant. *Wm. F. Sheehan* and *W. T. Worthington*, for respondents.

DANIELS, J. The applicant shows by his petition that the street commissioner of the city of Buffalo was empowered by the common council of the city to select 13 health and street inspectors of the city of Buffalo; that under the civil service rules adopted and in force in the city of Buffalo, the relator was certified to the street commissioner for one of such appointments, and his selection for that office was reported by the commissioner to the common council of the city. By section 50 of title 2 of the existing charter of the city, the street commissioner was empowered, by and with the advice and consent of the common council, to appoint the applicant with a sufficient number of others to supply the offices as street and health inspectors of the city. The common council, however, in the action which they took upon the selections by the street commissioner on the 7th day of May, 1888, declined to consent to the appointment of the applicant, and it "is to oblige the common council to give such consent that this application for the writ of *mandamus* has been made." And it proceeds upon the statement that the applicant is "an honorably discharged Union soldier of the war of the rebellion, having suffered no physical impairment incapacitating him from the full performance of his duty as such street and health inspector, and having the business capacity necessary to discharge the duties of that position, and was so certified by said civil service commission to said street commissioner." It is further stated in the petition "that subsequent to such appointment, and on or about the 7th of May, 1888, the said Henry Quinn, street commissioner, communicated and transmitted to the common council of the city of Buffalo his appointment of your petitioner as health and street inspector."

The application in behalf of the petitioner has been made under the authority of chapter 464 of the Laws of 1887, which has provided that "in every public department and upon all public works of the state of New York, and of the cities, towns, and villages thereof, and also in non-competitive examinations under the civil service laws, rules, or regulations of the same, wherever they apply, honorably discharged Union soldiers and sailors shall be preferred for appointment and employment. Age, loss of limb or other physical impairment, which does not in fact incapacitate, shall not be deemed to disqualify

them, provided they possess the business capacity necessary to discharge the duties of the position involved." This act is an amendment of chapter 312 of the Laws of 1884, which, when that was enacted, applied only to the public works of the state, but by section 4, c. 410, Laws 1884, it was provided that persons who had been honorably discharged from service in the army or navy of the United States in the late war should be preferred for appointment to positions in the civil service of the state and of the cities over other persons of equal standing. And this was further amended by chapter 29 of the Laws of 1886, making the enactment more clear and distinct in securing the preference of this class of persons to appointments, and they have been framed with such a degree of clearness, as they are now enacted, as to render them capable of being carried into effect according to the fair understanding of the language employed in their enactment. But by way of answer to the application for the writ it has been insisted that the inspectors are not officers of the city, and therefore not entitled to this preference under the laws. But this objection is answered, not only by the duties and functions the inspectors may be expected to perform and exercise, but also by title 2 of the chapter containing the provision authorizing their selection and appointment, which includes them among and as officers of the city. It has been further urged that these acts do not apply to the office of inspector, for the reason that the bond of the commissioner himself will render him liable for their delinquencies or non-performance of duties. But that appears to be a mistake, for, as the bond has been defined by section 16 of title 2 of the charter, it includes no liability whatever for the acts of these inspectors.

A further objection has been raised that the laws themselves securing this preference have been enacted in violation of section 1, art. 12, of the constitution of the state, declaring that no other oath, declaration, or test shall be required as a qualification for any office or public trust than that contained in this section of the constitution. But those acts quite manifestly are not within this prohibitory clause; for no oath, declaration, or test whatever has been required by them from the persons to whom this preference has been secured by the statutes. The only words of the prohibitory clause supposed to be applicable to the case are those forbidding any other test as a qualification for office or public trust. But these statutes clearly require no test whatever from the applicant, and the case, therefore, cannot be brought within the meaning of this word. What it was intended to mean as it has been employed in the constitution is to be ascertained from the preceding history of the English people. The government of that people did exact tests from persons appointed or selected for official position beyond the oath required for the faithful observance of their duties, and those tests were of the nature to bring the appointee within the established church of the realm. And every person incapable of subscribing to such tests was disqualified from holding the office which he would otherwise be entitled to hold. These tests were more specially prescribed by an act passed in the reign of Charles II., directing all officers, civil and military, to take the oaths and make the declarations against transsubstantiation in any of the king's courts in Westminster, or at the quarter sessions, within six calendar months after their admission, and also within the same time to receive the sacrament of the Lord's supper according to the usage of the Church of England, in some public church, immediately after divine service and sermon, and to deliver into court a certificate thereof, signed by the minister and church-warden, and also to prove the same by two credible witnesses, upon a forfeiture of £500 and disability to hold such office. 2 Shars. Bl. Comm. 58. A similar prohibition was also inserted in the constitution of the United States that declared that "no religious test shall ever be required as a qualification to any office or public trust under the United States." And the design of that has in like manner been considered to go no further than to prevent and prohibit the tests prescribed by the statutes of the

kingdom of Great Britain, and all other tests which the ingenuity of fanaticism might invent. 2 Story, Const. §§ 1847–1849. It is quite clear, therefore, that this prohibition contained in the constitution of the state in no way interfered with the power of the legislature to enact these statutes. Neither does it deprive the legislative department of the power of prescribing such qualifications for public offices as will secure the intelligent and competent discharge of their duties.

It has been further objected by the counsel for the city that the laws are in conflict with section 1 of amend. 14, Const. United States, prohibiting the state from making or enforcing "any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any state deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." The only part of this section which by any possibility could be relied upon by way of argument to defeat the application is that contained in the last branch of the sentence. But neither of these statutes has denied to any person within the jurisdiction of the state the equal protection of its laws. No citizen is deprived of any right or privilege constitutionally secured to him by reason of those laws. A preference only for official employment has been given to honorably discharged soldiers and sailors as a reward for meritorious service performed by them during the war, by which the Union was sustained, and the rebellion suppressed. So far as the laws extend, there seems to be no constitutional objection against their validity; and no officer or appointing power —as these words have been employed in the statutes of 1886—has authority to deny this preference to the class of persons who are brought within the provisions of these statutes. And where the proceeding may be such as arbitrarily to deny the privilege secured by these statutes a *mandamus* would be the appropriate remedy to enforce the performance of the duty. *People* v. *Leonard,* 74 N. Y. 443. And authority for its allowance has been secured by sections 2068 and 2070 of the Code of Civil Procedure.

But a radical defect appears in the petition, preventing the success of the applicant's motion, for it has nowhere been stated that the fact that he was an honorably discharged Union soldier of the war of the rebellion had been brought to the attention of the common council before it took its action upon the selections or appointments of the street inspectors. It has been stated in the petition that this fact was brought to the knowledge of the commissioner himself, and it rightly, on that account, influenced his action. But the petition does not show that knowledge of this fact was communicated to the common council. All that is stated upon this subject is that the commissioner communicated and transmitted to that body his appointment of the petitioner as health and street inspector. This was very far from apprising that body of the fact that he had been selected and appointed, or was entitled to be, under the laws securing to him this preference as a discharged Union soldier. Without notice of that fact the common council was authorized and empowered to proceed with the consideration of the case precisely the same as though the fact itself did not exist, and to reject his selection and appointment under the authority of the charter, rendering it dependent upon the advice and consent of the common council. On this account the application of the petitioner must fail, and the motion for the writ of *mandamus* will be denied.