C. H. SHAW, Appellant, v. THE CITY COUNCIL OF MARSHALLTOWN, Marshall County, Iowa, ET AL.

**Constitutional law:** SOLDIERS PREFERENCE STATUTE. The Act of the Thirtieth General Assembly providing a preference of honorably discharged soldiers and sailors of the Civil War who are residents of this state, in the appointment, employment and promotion in the public service over others of equal qualification, is not in violation of the fourteenth amendment of the Federal Constitution.

**Same:** SPECIAL PRIVILEGES. The right of appointment to a minor municipal office is not a privilege within the meaning of section 6, article 1, of the State Constitution, so that the Soldiers Preference Act of the Thirtieth General Assembly is not in violation of the constitution because granting to a class of citizens privileges or immunities not equally open to all. Bishop and Weaver, J. J., dissenting.

**Mandamus:** APPOINTMENT TO OFFICE. Mandamus will lie to compel the appointment to office of an honorably discharged soldier under the Act of the Thirtieth General Assembly.

*Appeal from Marshall District Court.*— HON. OBED CAS-
WELL, Judge.

TUESDAY, NOVEMBER 21, 1905.

Rehearing denied Friday, June 29, 1906.

THIS is an action of mandamus brought to obtain an
order commanding the city council of the city of Marshall-
town to employ the plaintiff as city clerk of said city. It is
bottomed on chapter 9 of the Laws of the Thirtieth General
Assembly, which reads as follows:

Section 1. Preference in Appointments and Promo-
tions. That in every public department and upon all public
works in the state of Iowa, and of the counties, cities and
towns thereof, honorably discharged soldiers, sailors and
marines from the army and navy of the United States in the
late Civil War, who are citizens and residents of this state,
shall be entitled to preference in appointment, employment
and promotion, over other persons of equal qualifications,
and the person thus preferred shall not be disqualified from
holding any position hereinbefore mentioned on account of
his age or by reason of any physical disability, provided such
age or disability does not render him incompetent to perform
properly the duties of the position applied for, and when
such soldier, sailor or marine shall apply for appointment or
employment under this act, the officer, board or person whose
duty it is or may be to appoint or employ some person to fill
such position or place shall, before appointing or employing
anyone to fill such position or place, make an investigation
as to the qualifications of said soldier, sailor or marine for
such place or position, and if he is a man of good moral char-
acter and can perform the duties of said position so applied
for by him, as hereinbefore provided, said officer, board or
person shall appoint said soldier, sailor or marine to such
position, place or employment. A refusal to allow the
preference provided for in this and the next succeeding sec-
tion to any honorably discharged soldier, sailor or marine,
or a reduction of his compensation intended to bring about
his resignation or discharge, entitles such honorably dis-

charged soldier, sailor or marine to a right of action therefor
in any court of competent jurisdiction for damages, and also
a remedy for mandamus for righting the wrong.

Sec. 2.  Removals.  Any person whose rights may be
in any way prejudiced contrary to any of the provisions of
this section shall be entitled to a writ of mandamus to remedy
the wrong.  No person holding a position by appointment or
employment in the state of Iowa, or in the several counties,
cities or towns thereof, who is an honorably discharged sol-
dier, sailor or marine having served as such in the Union
army or navy during the late Civil War, shall be removed
from such position or employment except for incompetency
or misconduct shown after a hearing, upon due notice, upon
stated charges, and with the right of such employé or ap-
pointee to a review by writ of certiorari.  The burden of
proving incompetency or misconduct shall rest upon the party
alleging the same.  Nothing in this act shall be construed to
aplly to the position of private secretary or deputy of any
official or department, or to any person holding a strictly
confidential relation to the appointing officer.

The plaintiff is an honorably discharged soldier from the
army of the United States in the late Civil War and a citizen
and resident of the state.  He alleged in his petition that
he had made an application for the position of city clerk of
said city and that the city council, " without consideration
of said application and in total disregard of said law and
without investigation," refused to appoint him to the po-
sition and appointed as such city clerk one L. Derby, who
was not a soldier of the late Civil War.  The defendant de-
murred to the petition on the ground that the act is uncon-
stitutional, being in violation of section 6 of article 1 of the
Constitution of the state, which provides that the " General
Assembly shall not grant to any citizen, or class of citizens,
privileges or immunities which upon the same terms shall
not equally belong to all citizens," and in violation of sec-
tion 1 of article 14 of the amendments to the Constitution
of the United States, which provides that " no state shall
make or enforce any law which shall abridge the privileges or

immunities of citizens of the United States, nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws," and, further, because the statute contravenes section 1 of article 1 of the Constitution of the state, which declares that " all men are by nature free and equal and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property and pursuing and obtaining safety and happiness," and, fourth, because the writ of mandamus could only issue " to compel the defendant's council to act, but not to control its discretion in action." The demurrer was sustained generally, and, the plaintiff electing to stand on his petition, there was a judgment dismissing the suit. The plaintiff appeals.— *Reversed.*

*Theo. F. Bradford, Chas A. Clark,* and *Warren Walker,* for appellant.

*C. H. Van Law,* for appellees.

SHERWIN, C. J.— But little need be said concerning the national Constitution. The fourteenth amendment declares that no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States. The privileges and immunities here protected are those of citizens of the United States, as distinguished from the citizens of a state, and the fourteenth amendment deals only with the rights of citizens of the United States as such. *Blake v. McClung,* 172 U. S. 239 (19 Sup. Ct. 165, 43 L. Ed. 432); *Slaughter House Cases,* 16 Wall. 36 (21 L. Ed. 394). In *Minor v. Happersett,* 21 Wall. 162 (22 L. Ed. 627), it was held that the amendment did not add to the privileges and immunities of a citizen, but simply furnished an additional guaranty for the protection of such as he already had, and it was said:

1. CONSTITUTIONAL LAW: soldiers preference statute.

" Indirectly it may have had that effect, because it may have increased the number of citizens entitled to suffrage under the Constitution and laws of the states; but it operates for this purpose, if at all, through the states and the state laws, and not directly upon the citizen." The case was one which involved the right of women to vote in the state of Missouri, and it was held that, while they might be citizens, the Constitution of the United States had not added the right of suffrage to the privileges and immunities of citizenship as they existed at the time it was adopted. See, also, *Bradwell v. State,* 16 Wall. 130 (21 L. Ed. 442); *In re Lockwood,* 154 U. S. 116 (14 Sup. Ct. 1082, 38 L. Ed. 929); *Dent v. West Virginia,* 129 U. S. 114 (9 Sup. Ct. 231, 32 L. Ed. 623); *Newton v. Board,* 100 U. S. 548 (25 L. Ed. 710); *Wilson v. State of North Carolina,* 169 U. S. 586 (18 Sup. Ct. 435, 42 L. Ed. 865); *Van Valkenburg v. Brown,* 43 Cal. 43 (13 Am. Rep. 136.)

Does the statute in question contravene the provisions of section 6, article 1, of the state Constitution, which says that the General Assembly shall not grant to any citizen or class of citizens privileges or immunities which upon the same terms shall not equally belong to all? Whether it does or not clearly depends upon the answer that shall be made to the further question whether the right of appointment to a minor municipal office is a privilege within the meaning of the Constitution. That the right to hold office, as one of the privileges protected by the Constitution, was not contemplated by its framers, is manifest from the Constitution itself. The right of suffrage is given to male citizens only (section 1, article 2), and there are provisions expressly limiting the right to hold certain offices to the male citizens of the state. The Constitution itself implies that women may become citizens of the state, and they undoubtedly are, and yet it will not be claimed that they are entitled to hold offices under this provision of the Constitution. See *Minor v. Happersett,* 21 Wall. 162 (22 L. Ed. 627);

2. SAME: special privileges.

*Huff v. Cook,* 44 Iowa, 639; Opinion of Judges, Mass. Supreme Court, 115 Mass. 602.   The precise meaning of the words "privileges and immunities" is not very definitely settled by the decisions.   In speaking of the words as used in the Constitution of the United States, Mr. Justice Curtis, in *Conner v. Elliott,* 18 How. 591 (15 L. Ed. 497), said: "We do not deem it needful to attempt to define the meaning of the word 'privileges' in this clause of the Constitution.   It is safer and more in accordance with the duty of a judicial tribunal to leave its meaning to be determined in each case upon a view of the particular rights asserted and denied therein."   In *Corfield v. Coryell,* 4 Wash. C. C. 371, Fed. Cas. No. 3,230, the question was considered by Mr. Justice Washington, who said in part: "What are the privileges and immunities of citizens in the several states? We feel no hesitation in confining these expressions to those privileges and immunities which are, in their nature, fundamental, which belong of right to citizens of all free governments, and which have at all times been enjoyed by the citizens of the several states which compose this Union from the time of their becoming free, independent, and sovereign." This statement of the general meaning of the words has been often approved by the Supreme Court of the United States, and, while the language was used with reference to the Constitution of the United States, it is none the less applicable to the Constitution of this state, so far as a definition of the word "privileges" is concerned.

Limiting our discussion to the precise question under consideration, is the right to hold office one of the fundamental privileges which belong of right to all the citizens of the states, to be classed as a natural right and standing equally with the rights of life, liberty, and property?   The right to hold office can be no more a natural and a personal right, nor more sacred, than the right of suffrage, and it is the general holding of the courts that the right of suffrage is not a natural and personal right, but a political and civil

right. It owes its existence to the constitution of civil government and not to the personality of the individual; nor does the right necessarily follow and become an attribute of citizenship, as we have already pointed out. It is a right which is conferred, withheld, or limited at the pleasure of the people, acting in their sovereign capacity. Once granted, it may be taken away by the same power that granted it, and it is therefore not a natural right, which is held to be inalienable like the rights of conscience. *Hale v. Everett*, 53 N. H. 9 (16 Am. Rep. 82) ; *Barker v. People*, 3 Cow. (N. Y.) 686 (15 Am. Dec. 322) ; *People v. Barber*, 48 Hun, 198; *Anderson v. Baker*, 23 Md. 531; Minor v. Happersett, *supra; Blanck v. Pausch*, 113 Ill. 64; *Morris v. Powell*, 125 Ind. 315 (25 N. E. 231, 9 L. R. A. 326); *Gougar v. Timberlake*, 148 Ind. 41 (46 N. E. 339, 37 L. R. A. 644, 62 Am. St. Rep. 487) ; Mechem on Public Officers; *Bryan v. Cattell*, 15 Iowa, 538; *People v. Loeffler*, 175 Ill., 585 (51 N. E. 785) ; *Van Valkenburg v. Brown*, 43 Cal. 43 (13 Am. Rep. 136). A public office has in it no element of property, but it is rather a personal public trust, created for the benefit of the state, and not for the benefit of the individual citizens thereof. Nor are the prospective emoluments of a public office property in any sense, for the salary or other perquisites may be reduced or otherwise regulated by law at all times, unless such change is forbidden by the Constitution. *Bryan v. Cattell*, 15 Iowa, 553; *Ex parte Lambert*, 52 Ala. 79; *Taylor v. Beckham*, 178 U. S. 548 (20 Sup. Ct. 890, 44 L. Ed. 1187) ; *Donahue v. County of Will*, 100 Ill. 94.

The state has the same freedom of employment that belongs to the individual, and no one will contend that the individual may not employ any person whom he wishes to employ, or that he may not choose his employés from a certain class. If it were otherwise, liberty of contract would be destroyed, and legislation in that direction would be clearly unconstitutional. The right to pursue any lawful calling in

a lawful way is undoubtedly a fundamental right; but there is a marked distinction between this right and the so-called right to be employed by a particular person or in a particular line of service. For the purpose of government, the counties, cities, and towns of the state are its agents and under its control; and what the state may constitutionally do with reference to public matters it may direct its agents to do, and by the act in question the state has simply said that it will employ in all public departments and upon all public works only those of a certain class of its citizens, other things being equal.

Nor do we believe that the act is class legislation, within the accepted meaning of the term. It imposes no special obligations or burdens on those who are excluded from its benefits, and, as we have seen, privileges may be granted to particular individuals without reserve when by so doing the rights of others are not interfered with. It does not forbid the right to the acquisition or enjoyment of property, nor prevent the disposal of person or property, which may be conceded to be among the natural rights, and to be protected by the natural liberty of the individual. That equality of rights, privileges, and capacities should be the aim of the law no one will question. But we are not here called upon to deal with the question of inequality in privileges or immunities, for the right to hold a public office or to be employed by the state in any capacity is not a privilege within the meaning of the Constitution; and, if our conclusion on this question is right, it follows that there can be no inequality or injustice in the statute under consideration, for the sufficient reason that no right protected by the Constitution has been invaded. And consequently our conclusion that the statute does not contravene either the Constitution of the United States or the Constitution of this state is not in conflict with the cases cited by the appellee on the question of the equality of privileges and immunities, among which is the case of the *State v. Garbroski,* 111 Iowa, 496.

It is fundamental that the Legislature has the power to legislate on all subjects, unless it is expressly or impliedly prohibited from so doing by the Constitution, and the act of the Legislature which is assailed must be plainly at variance with the Constitution before the court will so declare it. All doubtful questions will be resolved in favor of the validity of the act. *Stewart v. Board of Supervisors,* 30 Iowa, 9; *Huff v. Cook,* 44 Iowa, 639. See, also, *Jacobson v. Massachusetts,* 197 U. S. 11 (25 Sup. Ct. 358, 49 L. Ed. 643).

That the principal question involved in this case is not entirely free from doubt may be conceded, but after a full examination of the principles involved and the reasoning of the cases supporting our conclusions, we are satisfied that the act is not unconstitutional. Furthermore, similar acts have been sustained in several of our sister states, and, while the constitutional question under consideration has not been considered in many of the decisions, they nevertheless lend support to our conclusion in a general way. The leading case is *In re Wortman,* 2 N. Y. Supp. 324. This decision was followed by the New York courts until the state Constitution was amended in 1894, giving preference of employment to veterans. *People v. Stratton,* 80 N. Y. Supp. 269; *People v. Tobey,* 153 N. Y. 381 (47 N. E. 800); *People ex rel. Fallon v. Wright,* 150 N. Y. 444 (44 N. E. 1036); *People v. Lathrop,* 142 N. Y. 113 (36 N. E. 805); *Lewis v. Board,* 51 N. J. Law, 240 (17 Atl. 112); *Ingram v. Board,* 63 N. J. Law, 542 (43 Atl. 445); *MacDonald v. Newark,* 5 N.J. Law, 267 (26 Atl. 82); *State v. Miller,* 66 Minn. 90 (68 N. W. 732); *Goodrich v. Mitchell,* 68 Kan. 765 (75 Pac. 1034, 64 L. R. A. 945, 104 Am. St. Rep. 429); Opinion of Justices, 166 Mass. 589 (44 N. E. 625, 34 L. R. A. 58); Opinion of Justices, 145 Mass. 587 (13 N. E. 15). The Constitution of Kansas differs from our own with respect to granting privileges. The Kansas Bill of Rights contains the provision " that no special priviliges or immunities shall ever be granted by the Legislature which may not be altered, re-

voked, or repealed by the same body, and this power shall
be exercised by no other tribunal or agency." And it is
probably true that the Goodrich case is. not an authority on
the constitutional question that we have before us.

·The appellee relies on *Brown v. Russell,* 166 Mass. 14
(43 N. E. 1005), and on *State v. Whitcom,* 122 Wis. 110
(99 N. W. 472), as authorities against the constitutionality
of the law, but neither is so in fact. In Brown v. Russell the
precise question determined was whether the Legislature could
" constitutionally provide that certain offices and employ-
ments which it has created shall be filed by veterans in
preferment to all other persons, whether the veterans are or
are not found or thought to be actually qualified to per-
form the duties of the office and employments by some im-
partial and competent officer or board charged with some pub-
lic duty in making the appointments." And it was held
that such legislation was unconstitutional because the ap-
pointing power could not be compelled to appoint to public
offices persons of a certain class, in preference to all others,
regardless of their qualifications. In State v. Whitcom, *su-
pra,* the question here presented was not involved and was
not decided.

Our conclusion is not without support in principle in
our own cases, however. By chapter 7, page 6, of the Laws
of the Extra Session of 1861, it was provided that in all ac-
tions then pending in any of the courts of this state it should
be sufficient cause for a continuance on motion of the de-
fendant if it was shown that he was absent from home in the
military service of the United States. This act was assailed
as unconstitutional in *McCormick v. Rusch,* 15 Iowa, 127,
but it was upheld in an opinion written by Mr. Justice
Wright, wherein it was said: " In the first place, it may
be doubted whether it is a law of a general nature within
the meaning of the Constitution. This conceded, however,
why is not its operation uniform? It gives the same rule
to all persons placed in the same circumstances. It does not

prescribe one rule for one citizen or soldier, and another for his neighbor, if they are in the same situation.   .   .   . So all persons in the actual military service of the United States, or of this state, can claim the benefit of the statute, and any one can have the same benefit if in the service. Those that are not, are not entitled to the same advantage (so to speak), because, in the discretion and wisdom of the Legislature it was deemed inexpedient.   And yet this advantage may be, and is, extended to all upon the same terms.   See *Dalby v. Wolf and Palmer,* 14 Iowa, 228, and cases there cited."

Again, in 1862, an act was passed exempting the property of Iowa-volunteers in the military service of the United States from levy and sale, and this act was sustained in *Hannahs v. Felt,* 15 Iowa, 141.   And a later act in the same year permitted citizens of the state in the military service to cast their votes outside of the state of Iowa.   This act was also assailed as unconstitutional, but its validity was sustained by this court in an opinion that was also written by Mr. Justice Wright, in which it was said:  " But let us suppose there is doubt as to the correctness of the above construction, then what is our duty in the premises?   The law has been passed by the Legislature, a co-ordinate branch of the government, acting under like solemn obligations and responsibilities with ourselves, has been approved by the executive, who has taken a like oath to support the Constitution, and we are now called upon to declare it invalid.   If it is so in our judgment — that is, if we conclude that the infraction is clear, palpable, and plain — then most unquestionably it is our duty to so declare.   .   .   .   We cannot forget that among the fundamentals of the law is the proposition that we can declare an act void only when it violates the Constitution clearly, palpably, plainly, and in such manner as to leave no doubt or hesitation on our minds.   .   .   . It is certainly true that we cannot, with conclusive satisfaction, place our finger upon the language of the Constitu-

tion which is clearly and palpably violated (*Sears v. Cottrell,* 5 Mich. 251), and, though we might not be satisfied of its constitutionality, it is our duty to uphold the law." The language last quoted is peculiarly applicable to the situation in this case. A Legislature containing many able lawyers, and an executive who is himself one of the ablest lawyers in the state, all acting under the solemn obligation to support the Constitution of the state, have passed upon the act, and we should not declare it unconstitutional unless we find it clearly and plainly so.

Finally, the allegations of the petition presented a case that left no matter to the discretion of the defendants. The case thus presented was admitted by the demurrer, and there is no question of discretion involved in the case. The act itself provides for a remedy by mandamus, and we think there is no merit in the appellees' suggestion that the writ will not lie. The demurrer to the petition should have been overruled.

3. MANDAMUS: appointment to office.

The judgment is therefore reversed, and the case remanded for further proceedings not inconsistent with this opinion.— *Reversed.*

BISHOP, J. (dissenting).— I am unable to yield my assent to the general conclusions reached by the majority of the court, as found expressed in the opinion written by the Chief Justice. Without foreword, I go directly to a consideration of the questions involved, and to a statement of the reasons which impel me to declare for an affirmance of the judgment appealed from. Whoever runs may read that to the legislative power of the state is intrusted the exclusive right to formulate and proclaim the written law of the state. And it is to be said that this right is subject to but one limitation, and that is that no legislative act may be put forth which shall operate to contravene any of the expressed provisions of the written Constitution of the state, or have the effect to interfere with or take away any

of those inalienable rights of the citizen which lie behind the Constitution and to which that instrument is itself subordinate. And it is at the point of limitation that the duty of the courts begin. We may not consider the wisdom or policy of any law. It is for us to consider only those questions which arise upon challenge of an act of the Legislature as in excess of the constitutional right.

In turning to the Constitution, we find it written that " We the people " declare that " all men are by nature free and equal, and have certain inalienable rights, among which are those of enjoying and defending life and liberty," etc. Such is the primal declaration of the instrument, and not only was it selected to lead all the other provisions thereof, but it was intended to give character to each and every of such provisions. Stated otherwise, the Declaration served not only to make announcement of the flaming sentiment which dominated the hour in which it was put forth, but it heralded the adoption of that sentiment as the corner stone of our constitutional form of government. Impressed with this thought, it is not possible for me to say, as it must be said in order that the legislative act now before us may be sustained, that within the contemplation of those delegated citizens who framed the instrument, and of the people who ratified it at the polls, such primal declaration should be subject to future interpretation as no denial of legislative right to make distinguishment between the citizens of the state in respect of their rights as citizens. And I have studied the instrument with some degree of assiduity, and I find therein no expressed word, nor does there arise therefrom any suggested thought, upon which reliance may be placed for such interpretation. On the other hand, and in direct line with the primal declaration, there is to be found the provision upon which the demurrer in this suit was predicated, that " the General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which upon the same terms shall not equally be-

long to all citizens." And, turning over the page, this also is enjoined upon the Legislature: "Where a general law can be made applicable all laws shall be general and of uniform operation throughout the state." What I contend for, stated in a sentence, is this: That in virtue of the provisions of the Constitution, adopted long before the War of the Rebellion, there is conferred upon and guarantied to every citizen the right, political in its nature, to compete on equal terms with every other citizen for any office or employment created for the benefit of the state. As a necessary corollary, I declare for the impotency of every legislative act whereby it is sought to abridge or work inequality in such right; and in so declaring I do no more than to announce my belief in and adherence to the doctrine to which this court has heretofore stood committed. Said Cole, J., in writing the opinion in Clark v. Board, etc., 24 Iowa, 266: "In view of the principle of equal rights to all, upon which our government is founded, it would seem necessary, in order to justify a denial of such equality of right to any one, that some express sovereign authority for such denial should be shown." The case was one arising under the clause of the Constitution which declares that provision shall be made "for the education of all the youths of the state through a system of common schools." It appears that an attempt had been made to require all colored children to attend a school separate from that provided for the attendance of white children, and the right so to do was denied upon constitutional grounds. The opinion proceeds: "All the youths are equal before the law, and there is no discretion vested in the board of directors, or elsewhere, to interfere with or disturb that equality." The italics are mine. So, too, this was said in the course of the opinion in State v. Garbroski, 111 Iowa, 496: "Equality in right, privilege, burdens, and protection is the thought running through the Constitution and laws of the state; and an act intentionally and necessarily creating inequality therein,

based on no reason suggested by necessity or difference in condition or circumstances, is opposed to the spirit of free government, and expressly prohibited by the Constitution." And again: "The Constitution aims at equality of rights, privileges, and capacities, and the state has no favors to bestow, except such as, from the nature of the case cannot be possessed and enjoyed by all."

Of course, I do not wish to be understood as in any sense making denial of the doctrine that, for the purposes of efficient and beneficial legislation, the lawmaking power may, where necessary, divide the subjects upon which such legislation is intended to operate into classes. Nor do I deny but that in many cases, where the peculiar relations or circumstances suggest the necessity or propriety thereof, the General Assembly may so legislate, either specially or generally, that a privilege shall result to individuals or to a class of individuals. Indeed, the very language of the Constitution contemplates that in proper cases such may be done. But it remains to be said that this power is confined in its operation to matters solely nonpolitical; for instance, such matters as are incident to social or industrial life, or which have relation in some form to the exercise of property rights. In no case has it ever been rightfully extended, nor can it ever be while the Constitution lasts, to those things the subject-matter whereof is by nature political, or which inhere in the essential fact of citizenship. And it is to be remembered that the power thus conceded to exist can only be exercised upon some apparent reason suggested by necessity. "All the authorities agree that the distinction in dividing may not be arbitrary, and must be based on differences which are apparent and reasonable." State v. Garbroski, *supra.* "Privileges may be granted to particular individuals when by so doing the rights of others are not interfered with; but every one has the right to demand that he be governed by general rules, and a special statute, which singles his case out to be regulated by different laws from those

that are applied in all similar cases, would not be legitimate legislation, but would be such an arbitrary mandate as is not within the province of free government. Those who make the laws are to govern by promulgated established laws, not to be varied in particular cases, but to have one rule for the rich and poor — for the favorite at court and the countryman at the plow." Cooley on Const. Lim. (6th Ed.), section 482. "Every partial or private law, which directly proposes to destroy or affect individual rights, or does the same thing by restricting the privileges of certain classes of citizens, and not all others, when there is no public necessity for such discrimination, is unconstitutional and void." *State v. Goodwill,* 33 W. Va. 179 (10 S. E. 285, 6 L. R. A. 623, 25 Am. St. Rep. 863); *Sutton v. State,* 96 Tenn. 696 (36 S. W. 697, 33 L. R. A, 589); *Railway v. Ellis,* 165 U. S. 150 (17 Sup. Ct. 255, 41 L. Ed. 666).

It will be observed, upon reading, that the opinion of the majority is made to turn upon the proposition that incident to citizenship there is no inherent right to hold office, either by election or appointment; and the conclusion is that, there being no right, and hence no privilege, there can be no invasion of the constitutional guaranty by providing in such matters through the medium of legislative fiat that one class of citizens may properly be subordinated to another class of citizens. As applied to this case the argument is wholly misplaced, and this I will proceed to demonstrate. To begin with, I deny that the case presents any question as of the right to hold office or to be given employment. I grant, freely and fully, that as applied to a particular citizen there is no inherent right to hold a particular office, or to have a particular employment. Accordingly it cannot be said that one is denied a constitutional privilege if, under the particular circumstances of his case, he is not permitted to enter upon the duties and to enjoy the emoluments of such office or employment. This is because — and I quote with approval the language of the Chief Justice —" a pub-

lice office has in it no element of property, but it is rather a personal public trust, created for the benefit of the state, and not for the benefit of the individual citizens thereof." The authorities cited in the majority opinion abundantly support the conclusion thus reached. Restated in another form, it is my contention that there is no power in the Legislature to compel the people of the state to make choice of their officers and employés from one class of citizens to the exclusion of another class, or all other classes; and it can make no difference whether the matter of choice is to be determined by a direct vote of the people or through an instrumentality which has been provided for that purpose. It is in no sense derogatory to the position that I occupy to make the further admission that the state may, when deemed necessary for the good of the service, prescribe reasonable qualifications for an office or employment, as, for instance, in the matter of age, physical condition, learning, etc.: all such are related, not to the matter of right, but to the question of personal fitness or competency. And, further, there is nothing in my position which conflicts in any way with the doctrine that the state may exercise the same freedom in making the choice of its servants and employés as belongs to an individual. As to this, if the office be elective, the people may choose by majority vote any one of the candidates. If an appointive office or employment, the appointing power may look over the field and freely make choice therefrom. And no one of the candidates may be heard to complain that the citizen on his right or left, having an equal right with himself, was selected as the one to fill the place. It is quite a different thing to say, however, that the appointing power must — not may — *arbitrarily, and based alone upon some past consideration,* arrange the candidates for appointment or employment, each confessedly competent, in two ranks, and that no one from the rear rank shall be selected while any remains to be chosen from the front rank. Who is there who needs argument to help him

.reach the conclusion that in such case the citizen candidates do not stand upon an equal footing, and that a special privilege is granted to those who occupy positions in the front rank over those who are forced to stand behind. Plainly enough, as it seems to me, there arises out of such a situation no question of inherent or vested rights to hold onto an office or employment or to be inducted into an office or employment.

The field of the question with which we have to deal lies back of all that. It is whether citizens generally — granting the matter of competency — shall have the right to present themselves upon equal footing one with another for any office or employment arising under the Constitution. It is to the existence of such constitutional right that I commit myself, and in defense of which I declare for the utter futility of any effort on the part of the Legislature to take it away. In the relation between the state and the citizen this right stands as the counterpart of that right which the former has to call to its aid and service every citizen, and this without reference to rank or any matter based upon past consideration, but having in view present conditions and needs alone. Moreover, if legislative power to grant privileges in character as proposed by the instant act were to be admitted, then it must follow of necessity that the sufficiency of the consideration necessary to support such a privilege is determinable alone from the expression of the legislative will; and this must be true because, in such view, the Constitution is silent upon the subject. Accordingly we might be compelled to approve an act, if presented, providing that no black man should be considered for appointment while there remained white men willing to serve the state. We would be compelled to remain silent in the face of an act providing that a preference should be given in all cases to graduates of the State University, or to citizens born within the state, or to those who own property up to a certain fixed value, or to those who belong to some fraternal or-

ganization or religious sect. I admit the improbability of
such extreme legislation. That is not the question; but
rather, would it be possible? To again sum up in a sen-
tence, it is the legislative right to enter such field and as-
sume to act therein that I deny; and I deny, not only be-
cause the Constitution in express terms forbids that such
shall be done, but because it would be inimical to every
proper notion of free government among men — a govern-
ment having for its cardinal doctrine that as to everything
having relationship to citizenship there shall be equal rights
for all and special privileges to none.

Again, it is said in the course of the argument of the
majority opinion that " the right to hold office can be no
more a natural and a personal right, nor more sacred, than
the right of suffrage, and it is the general holding of the
courts that the right of suffrage is not a natural and per-
sonal right, but a political right." As already stated, I
deny that the question at issue is in any wise related to the
right to hold office; but, if it were, there is no force in the
argument as thus made. Indeed, this is irrefutably shown
by what immediately follows in the opinion: " It [the
right of suffrage] owes its existence to the constitution of
civil government, and not to the personality of the indi-
vidual." And again: " It is a right which is conferred,
withheld, or limited at the pleasure of the people, acting in
their sovereign capacity." It will be observed that here an
appeal is made to the power of the sovereign people. I do
not find it necessary, even if I had the disposition, to ques-
tion the power of the people, speaking directly upon matters
of government, to either grant or withhold privileges; and
I am willing to concede that by vote of the people the right
to grant or withhold privileges may be delegated to the Leg-
islature. But we are not dealing with the powers of the sov-
ereign people. It is not a question whether there was power
in the people to put into the instrument, to stand as funda-
mental law of the state, a provision that only male citizens

should exercise the right of suffrage. We are dealing here with a question of legislative power, and the limitations which the people themselves have put thereon. It is as if by the Constitution the right of suffrage was declared simply to be an incident of citizenship; that is, for instance, as though the word "male" did not appear in the instrument. In the face of such a provision, and especially conceding, as our previous holdings do, that women are citizens, could any one be found to declare for the validity of an act of the Legislature providing that only males should exercise the right of suffrage? Or that only white men should vote? Or that only those who had served in the army or navy should vote?

That my position has abundant support in the authorities will be made plain by consulting the cases that I shall cite. I have already referred to the case of Clark v. Board. Let me add that it is quite evident to my mind that it did not occur to counsel who presented that case, or to the learned judge who wrote the opinion that, inasmuch as there was no absolute right on the part of children, black or white, to receive an education at the hands of the state, a result directly the opposite from that reached was dictated by the record. State v. Garbroski, *supra*, was one arising upon section 1347 of the Code, which provides, in substance, that peddlers shall pay a county tax; but "nothing in this section shall be held to apply . . . to persons who have served in the Union army or navy," etc. It was sought by the defendant to take his case out of the operation of the constitutional provision by making claim that the circumstances warranted the classification and privilege or immunity. The court refused to adopt such view, and it was said: "The classification here attempted rests solely on a past and completed transaction, having no relation to the particular legislation enacted. All citizens are divided [by the act] into two classes — those who served in the army and navy thirty-five years ago, and all those who did not. True, as sug-

gested, the veterans came from no particular class; but the trouble with this statute is that it attempts to make of them a class in legislation, in the operation of which there can be no substantial distinction between them and others. In present conditions and circumstances there are no differences between them, in their relation to society and the administration of the law, and other citizens of the state." *State v. Whitsom,* 122 Wis. 110 (99 N. W. 468), which case is put aside by the majority opinion as not in point, was an action involving the construction of a statute exempting ex-soldiers from payment of a tax. The statute was condemned, and in the opinion I find this language: "No one denies that to those who sacrificed their comfort, and often their health and vigor, to the public, there is a legitimate and proper feeling of gratitude from the entire community, which each member thereof should appreciate; but this does not answer the question whether by Constitutions enacted half a century or more ago there was conferred upon agents of the public — the Legislature — authority to coin this gratitude into all forms of favor, whether by direct donation or by exemption from the duties and burdens resting upon other citizens after these men had returned from their military service and again become as they were before part of the mass of citizenship." And it is said *arguendo* that "for the purpose of performing work for a government the ex-soldier stands upon no different footing from the civilian." See, also, the following cases, in which was involved the question presented by the Garbroski case; *State v. Shedroi,* 75 Vt. 277 (54 Atl. 1081, 63 L. R. A. 179); *Ex parte Jones,* 38 Tex. Cr. R. 482 (43 S. W. 513); *Com. v. Snyder,* 182 Pa. 630 (38 Atl. 356).

Reference is made in the majority opinion to the case of *Brown v. Russell,* 166 Mass. 14 (43 N. E. 1005). I do not agree with the Chief Justice as to the effect of the holding in that case. The question there presented was as follows: "Can the Legislature constitutionally provide that

certain public offices and employments which it has created shall be filled by veterans in preferment to all other persons, whether the veterans are or are not found or thought to be actually qualified to perform the duties of the offices and employments by some impartial officer or board charged with some public duty in making the appointments?" And the court said: "Public offices are created for the purpose of effecting the ends for which government has been instituted, which are the common good, and not for the profit, honor, or private interest of any one man, family, or class of men. In our form of government it is fundamental that public offices are a public trust, and that the person to be appointed should be selected solely with a view to the public welfare. . . . We are of opinion that [the statutes], so far as they purport absolutely to give to veterans particular and exclusive privileges distinct from those of the community in obtaining public office, cannot be upheld as enactments within the constitutional power of the General Court." Subsequent to the filing of the opinion in Brown v. Russell, the Legislature took the opinion of the justices of the Supreme Court upon the question of the constitutionality of the civil service law and rules of that state creating a preference in favor of veterans in the labor service of the state. Four of the justices certified that such might be done, and three certified that it could not be. I cannot within reasonable limits discuss the questions presented to the court or the reasoning of the answers made. The opinions will be found in 166 Mass. 589 (44 N. E. 625, 34 L. R. A. 58).

The case of *Evansville v. State*, 118 Ind. 426 (21 N. E. 267, 4 L. R. A. 93), on principle, is in point. The legislative act there under consideration provided that eligibility for appointment to the board of commissioners on fire and police should be based on five years' residence in the city. Accordingly there were two classes, those who had been residents five years and those who had not; and as to

this it was said: "To the first class, privileges and immunities are granted which upon the same terms do not equally belong to the second class." It will be observed that the case differs from the instant case only in the fact that there the privilege granted was without qualification, while here it is made dependent only upon the fact that an ex-soldier presents himself for the office or employment in question. It is to be remarked that it did not occur to the Indiana court that the classification attempted could be justified on the ground that no one had a natural or personal right to hold office. The legislative act there in question also classified the citizens of the city as to the positions and employments on the police force and in the fire department by requiring that all officers and employés be selected from the two leading political parties found in the city. As to this the court says: "It is well known that members of probably a half dozen political parties reside in the city, and that a large number of citizens reside therein who belong to no political party. All such are disqualified. If it was competent to require as a test  .  .  .  membership in a political party or organization, it is difficult to understand why a religious or any other test may not be made." And it was held that the act contravened not only the spirit but the letter of the Constitution. See, also, *State v. Denny,* 118 Ind. 449 (21 N. E. 274, 4 L. R. A. 65). That was an action brought to test the constitutionality of an act similar to the one involved in the Evansville Case, *supra,* and the same conclusion was reached. In the course of the opinion it was said that " the right to hold public office is a right which belongs alike to every voter residing within the political division of the state from which such officer is chosen, unless otherwise provided by the Constitution." I assume that it was not within the intended meaning of the language used by the court that any particular voter had any personal or natural right to any particular office, but rather that he had

the right common to all others to present himself as an applicant for any office to which he chose to aspire.

Of another class, but involving the same principle, is the case of *Fiske v. People,* 188 Ill. 206 (58 N. E. 985, 52 L. R. A. 291). In that case the court considered an ordinance of the city of Chicago which undertook to provide for a preference in favor of union labor, in connection with all work to be done under contracts with the city, and it was held that under the Constitution of that state — similar in its provisions to ours — the ordinance was void. See, also, *Adams v. Brenan,* 177 Ill. 194 (52 N. E. 314, 42 L. R. A. 718, 69 Am. St. Rep. 222), and *Holden v. Alton,* 179 Ill. 318 (53 N. E. 556); *Noel v. People,* 187 Ill. 587 (58 N. E. 616, 52 L. R. A. 287, 79 Am. St. Rep. 238). In the case of *Van Harlingen v. Doyle,* 134 Cal. 53 (66 Pac. 44, 54 L. R. A. 771), the court considered an act of the Legislature forbidding boards of supervisors from publishing official matter in a newspaper which had not been established in the county one year. There, too, the constitutional provision was the same as ours, and the act was held to be void. The court said: " The act confers particular privileges upon certain publishers, and imposes peculiar disabilities and burdensome conditions on other publishers, all of whom stand in the same relation to the law. It is not within the power of the Legislature to evade the operation of the constitutional provisions by creating an arbitrary and unnatural distinction between persons thus related to the law." I cannot undertake to carry further my discussion of the cases. The following, among others that might be cited, will be found to lend support, in principle at least, to my position: *Johnson v. Goodyear,* 127 Cal. 4 (59 Pac. 304, 47 L. R. A. 338, 78 Am. St. Rep. 17); *Blake v. McClung.* 172 U. S. 239 (19 Sup. Ct. 165, 43 L. Ed. 432); *State v. Ins. Com'rs,* 37 Fla. 564 (20 South. 772, 33 L. R. A. 288); *Maynard v. Association,* 92 Fed. 435 (34 C. C. A. 438); *In re Keymer,* 89 Hun, 292 (35 N. Y. Supp. 161);

*In re Dorsey,* 7 Port. 293; *Luman v. Hitchins,* 90 Md. 14 (44 Atl. 1051, 46 L. R. A. 393); *State v. Washburn,* 167 Mo. 680 (67 S. W. 592, 90 Am. St. Rep. 430); *Harmon v. State,* 66 Ohio St. 249 (64 N. E. 117, 58 L. R. A. 618).

I desire now to take brief note of the cases cited in the majority opinion, and consider how far my position is opposed by them. If I have read them aright, no one of them is authority for the conclusion in support of which they are cited. *State v. Miller,* 66 Minn. 90 (68 N. W. 732), may serve for a precedent, but it is not an authority. The opinion occupies but a few lines, and consists of a bare statement to the effect that a law giving preference to ex-soldiers in matters of public office or employment is not violative of the Constitution. There is no reasoning, nor is there citation of authority. The court contents itself by merely saying that " the county attorney states that he was directed by the county board to take the appeal, . . . but he suggests no reason why the act is unconstitutional. On the contrary, he admits that similar statutes have been held valid in other states. No provision of the Constitution occurs to us with which the act conflicts." The case relied upon as the leading one is *In re Wortman,* 2 N. Y. Supp. 324. Without stopping to discuss the weight that should be accorded the decision of an intermediate court, my reading persuades me that the case is not an authority on the question here involved. The laws of New York provided for a preference to veterans in the matter of appointments under the civil service laws of the state. Wortman, a veteran, brought his action — a proceeding for mandamus — to compel his appointment to the office of street inspector in the city of Buffalo. The application was defended against upon several grounds, but the only one having any pertinency here was that the law providing for preference was in conflict with section 1 of the fourteenth amendment to the federal Constitution. That section prohibits the state from making or enforcing " any law which shall

abridge the privileges or immunities of citizens of the United States, nor shall any state deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." The court undoubtedly had in mind the thought which is given expression to in the majority opinion in the instant case, that " the privileges and immunities here [in the fourteenth amendment] protected are those of citizens of the United States, as distinguished from the citizens of a state, and the fourteenth amendment deals only with the rights of citizens of the United States as such." This I take to be the situation, because the court, after quoting the fourteenth amendment, proceeds to say that the only provision thereof which by any possibility could be relied upon was the last, " nor deny . . . the equal protection of the laws." And it is then declared that the giving of a preference to veteran soldiers cannot be considered as a denial of equal protection. It is true that some language is used from which it may be inferred that the court undertook to write it down that no constitutional provision existed anywhere to which the law in question was vulnerable. But I think it fair to say that the loose and unguarded expressions found in the opinion ought to be given weight only as the same tend to a determination of the question the court had before it for decision. I have not gone to the reports to ascertain in what, if any, cases the Wortman case has been relied on as an authority. As to the other cases from the New York courts cited in the majority opinion, it is to be said of each that they were decided in accordance with a constitutional provision of that state declaring for a preference to veterans. Accordingly they have no value as authorities here. The Kansas case, as pointed out by the Chief Justice, was decided under a Constitution differing from ours. In no one of the remaining cases was any constitutional question raised or attempted to be decided.

In my judgment the cases of *McCormick v. Rusch,* 15 Iowa, 127, and *Hannahs v. Felt,* 15 Iowa, 141, do not lend any strength to the majority view. In the former no more was involved than the power of the Legislature to add to causes which might be assigned for the continuance of an action the fact that the defendant was absent in the military service of the general government. As the operation of the act was uniform, it was held that it was not assailable on constitutional grounds. My reading of the opinion in Hannahs v. Felt, *supra,* does not disclose that the constitutionality of the act there drawn in question was passed upon by the court. Speaking now of the case referred to by the Chief Justice involving the act which permitted citizens of the state in the military service to cast their votes outside of the state, I shall not attempt to discuss the question of the validity of the act, nor shall I say but little concerning the opinion as written. We all know that it was a time of dire distress, the clouds of civil war seemed about to overwhelm the government, and the vote of every loyal citizen was needed to enable it to hold up its hands. In this extremity the Legislature passed the act, and this court refused to condemn it, because unable to place its finger upon the exact language of the 'Constitution which was clearly and palpably violated. The opinion has passed into history as an example of what courage can impel even the judicial officers of a state to do in the face of an internecine struggle threatening dissolution of the government and the destruction of national life. I doubt if it will ever come to be regarded as a sound exposition of constitutional law.

In addition to what I have said, I desire to add that I am fully persuaded that the instant act is unconstitutional upon the further ground that the classification attempted is discriminative, as well as arbitrary and unreasonable. I have already taken so much time that I can justify no more than a mere statement of the point, and, indeed, it would seem that that ought to be sufficient. The

act gives a preference only to soldiers of the War of the Rebellion. It is well known that we have in our midst a remnant of the soldiers who engaged in the War with Mexico, and we have an army of men who followed the flag in the more recent War with Spain. Now if service in the army or navy could be made a ground of distinction such as to justify legislation granting a privilege of the character here intended, upon what possible theory can there be constitutional warrant for drawing a line between the men who fought at Vicksburg under Grant and those who followed Roosevelt up San Juan Hill? Certainly no one will claim that the one army was more conspicuous for bravery than the other. There is a difference in the fact situation in this: that the service in the one war was of longer duration and more arduous in character than the other. There is the further difference that the soldiers of the one war are now old men, while in the matter of the other the men are still young or in middle life. But out of such considerations can arise no ground upon which to plant an invasion upon constitutional rights. The soldier of 1861–65 is no more a citizen than is the soldier of the War with Mexico or the soldier of the War with Spain. From the viewpoint of the Constitution they are all citizens, and it is the mandate of " The People," speaking through that instrument, that there shall be equal rights for all and special privileges to none.

I am authorized to say that Mr. Justice Weaver concurs in the conclusions for which I contend.