# BOARD OF COMMISSIONERS OF NEWTON COUNTY *v.* STATE, EX REL. BRINGHAM.

[No. 20,157.   Filed January 8, 1904.]

CONSTITUTIONAL LAW.—*Local Laws.—Building County Court-houses.*— The building of county court-houses with county revenue is county business, within the meaning of §22, article 4 of the state Constitution, forbidding local and special laws regulating county business; nor does it lose the character of county business when made a part of a legislative scheme for the relocation of a county seat. *pp. 618–625.*

SAME.—*Relocation of County Seat of Newton County.—Building Court-house. —Local Legislation.—*The act of March 2, 1899, relative to the relocation of the county seat of Newton county, provides among other things that the successful petitioners for a new site shall pay all costs of appraisement of the public property at the old site, shall present the county with real estate for a new site, and present plans and specifications for a new court-house; that a special tax shall be assessed and collected of the township where the new court-house is to be located; and that if the election provided for is not carried for relocation, or if an election is not held

within two years the commissioners shall proceed to build at the old site. *Held,* that by such provisions, the act seeks to regulate the building of a court-house, and is unconstitutional as being local and special legislation. *Held,* also that the invalid provisions relative to the building of the court-house are so intimately connected with the provisions relative to the relocation that the latter provisions can not be sustained. *pp. 625–628.*

From White Circuit Court; *T. F. Palmer,* Judge.

Mandamus by the State on the relation of Elmer R. Bringham against the Board of Commissioners of Newton county. From a judgment for relator, respondent appeals. *Reversed.*

*William Darroch, F. C. Cutter* and *A. C. Harris,* for appellant.

*R. P. Davidson, Allen Boulds* and *E. B. Sellers,* for appellee.

HADLEY, J.—This is a mandate proceeding to compel the board of commissioners of Newton county to let a contract and build a court-house at Goodland, in said county. The complaint and alternative writ state the same facts which the circuit court held sufficient on demurrer. The appellant answered in four special paragraphs, each of which the court held insufficient on demurrer, and ordered appellant "to let the contract for and cause a court-house to be constructed at the town of Goodland without delay." The action is grounded on a proceeding to relocate the county seat under the provisions of an act of the General Assembly approved March 2, 1899 (Acts 1899, p. 210). The complaint shows a compliance with all the requirements of the act, and a successful vote on a petition for a relocation at the town of Goodland.

The chief questions involved, and which arise upon the pleadings, rest upon the constitutional validity of the act of 1899, *supra,* and the construction to be given certain provisions of the act "concerning county business" known as the county reform law, approved March 3, 1889 (Acts

1899, p. 343). Appellant affirms that the act is unconstitutional for several reasons, but under the view of the case we have taken it is necessary to consider only one, namely, is the act invalid under §22 of article 4 of the Constitution which declares that "the General Assembly shall not pass local or special laws * * * regulating county and township business ?" A decision of this question involves the inquiry (1) is the building of a county. court-house for county purposes with county revenue, county business, and (2) does the act under review undertake to regulate the building of the court-house in Newton county, within the constitutional inhibition ?

1.  In approaching the consideration of the subject we give such respectful heed as duty warrants to the influences alleged by counsel for appellee to have induced the General Assembly to adopt the special legislation in question. They say: "The legislature had before it the disturbed condition of the county; the forty years of unrest and distraction over the removal question; and it would seem clear that the great *desideralum* was the termination of the strife, and the pacification of the county. To accomplish this, legislation coercive, decisive, and inclusive was necessary. This is apparent from the mandatory character of the act. In case of an insufficient vote in favor of removal the board is required by the seventeenth section to act upon a petition for the building of a court-house at Kentland within two days after its presentation. If the act had provided for nothing more than the removal of the county seat, and a successful vote had been taken, the skirmish line only of the contestants would have been passed, leaving the building of a court-house still undetermined, with possibly a majority of both board and county council disposed to baffle or defeat the consummation of the removal project."

Going, in some particulars, somewhat beyond the limit of judicial knowledge, and giving effect to undenied statements of counsel, we find in verification of the suggestion

above noted that Newton county is thirty miles north and south, and thirteen miles east and west. Kentland, the present county seat, is located two miles north of the southern boundary, and three miles east of the western boundary, and has no railroad facilities except such as are afforded by a single road running practically east and west. The original court-house, built in 1860, and which is still in use, and contains all the court and public records of the county, is a plain, cheap wooden structure, so advanced in decay and dilapidation that the entire edifice is said to shake when the court bell is rung over it. In the last twenty years the board of commissioners has entered an order for the construction of a new and adequate court-house at Kentland, and has ordered and held three elections—two unsuccessful and one successful—for the removal of the county seat to another place, but all plans and efforts have been frustrated by disagreements and contentions, and to this date nothing has approached a permanent location and permanent public buildings, nearer than an order-book entry. This unfortunate situation appeals for an earnest effort to find some sufficient ground upon which the act of 1899 may be sustained. But in indulging a desire to serve the inhabitants of Newton county we must not let our zeal lead us from the plain duty of giving effect to the Constitution. The people of Newton county, as much as of any other part of the State, were parties to the solemn compact that the provisions of the Constitution should be held to be the paramount law of the State; and, among other things, that the rights, duties, and powers of the legislative branch of the state government, as defined and determined by that instrument, should be thereby conclusively fixed. Therefore, as interpreters of the Constitution, we have no right or power to yield to sentiment or expediency, and bestow upon it a meaning not intended by the framers. If, when the Constitution was adopted, the building of a county court-house, with county means,

upon county grounds, for county purposes, was generally considered and treated over the State as county business, and was intended by the convention to be embraced within the classification of county business, as contained in §22, article 4, then it must be held that the legislature had no power to pass a local or special law regulating the same. To regulate is to direct by rule or restriction. Bouvier's Law Dict. The phrase "county business" has no prescribed or technical meaning, and the definition must be sought in the previous history and practices of the State. *State Board, etc., v. Holliday,* 150 Ind. 216, 233, 42 L. R. A. 826; *State, ex rel., v. Roby,* 142 Ind. 168, 182, 33 L. R. A. 213, 51 Am. St. 174; *Connecticut Mut. Life Ins. Co. v. Talbot,* 113 Ind. 373, 379, 3 Am. St. 655; *Stout v. Board, etc.,* 107 Ind. 343, 348. If we can ascertain the popular sense in which the term was employed in the laws and institutions of the State prior to the constitutional convention of 1850, we may safely accept that as the sense in which the Constitution makers intended it should have in that instrument.

Preliminary to the historical inquiry, we call attention to the fact that in the organization of the state government the territory of the State was subdivided into counties, townships, cities, and towns as governmental agencies, and each subdivision had conferred upon it certain powers, rights, and duties of a local character; that is, to be exercised and enjoyed within the particular district for local benefit, and in which other parts of the State had no direct interest or concern. Among these were the care of the poor, the construction and maintenance of highways, of school-houses, asylum for the poor, jail, court-house, and such other public buildings as became necessary in supplying adequate accommodations for the discharge of the duties required of the county or township. These and other like matters, which the municipality is required to provide with its own revenues, and according to the discretion and judg-

ment of its own officers, and which affect neither the personal or property rights of citizens outside the district, are naturally, accurately, and logically termed "county business," or "township business," as the case may be. How was it termed in the early history of the State? At the first session of the General Assembly, held at Corydon in 1816, our present system of boards of county commissioners was adopted, it being declared in the opening lines "that there shall be and hereby is organized in each county of this State a board of commissioners, for transacting county business," and by §4 it was provided that the board, when elected and qualified, shall constitute a body politic and corporate, and shall "do and transact, on behalf of the county, all business that shall be assigned to them by law." Acts 1816, p. 115.

In 1831 an act was passed "to regulate the mode of doing county business in the several counties of this State," in which §§1 and 4 of the act of 1816 were readopted under their old numbers, and in prescribing certain duties, required of the commissioners §24 enacts: "The circuit courts in counties where court-houses shall not have been erected, shall be holden for the time being, at the place designated by law or selected by the court; and the boards of commissioners in such counties, shall, with all convenient speed, proceed to the completion of a court-house, jail, and other public buildings for the same, and keep the same in repair." R. S. 1831, p. 129. Again, in 1838, an act was passed "to regulate the mode of doing county business in the several counties in this State," in which it was provided that county boards of commissioners should do whatever should be by law assigned to them, and in which act §24 of the act of 1831 was reenacted. R. S. 1838, p. 150. In the revision of 1843 the same provisions were continued, and §21 was made to read as follows: "The board of county commissioners shall proceed to cause a court-house, jail, and public offices for the clerk, recorder,

and auditor to be erected and furnished, where the same has not been done, and shall keep all the public buildings of the county in repair." R. S. 1843, pp. 181, 184. The act of 1843 was the law when the Constitution was adopted, and continued the law (constitutional schedule, item one) until 1852, when another act of the same general tenor was passed, entitled, "An act providing for the organization of county boards, and prescribing some of their powers and duties;" §16 of which act reads thus: "Such commissioners shall cause a court-house, jail, and public offices for the clerk, recorder, treasurer, and auditor, to be erected and furnished, where the same has not been done, and shall keep all public buildings of the county in repair, and such offices, if practicable, shall be made fireproof, and shall be occupied by such officers respectively." 1 R. S. 1852, pp. 224, 227. This section is still in force. §7833 Burns 1901. The history of state legislation discloses that while the people were not agreed as to the most expedient method of doing county business, they were always united in the view that the building of county court-houses was a part of it.

While the commissioners' act of 1816 was in full force and effect, the legislature, in 1824 (R. S. 1824, p. 86) passed another general law authorizing the several justices of the peace of each county to organize themselves into a board to do the county business, and providing that upon such organization being perfected, the existing board of commissioners of the county should thereby be dissolved, and all the powers and duties imposed upon such commissioners by law should be transferred to the board of justices of the peace. Subsequently certain counties were authorized by special acts to select three trustees to do their county business, and others to organize boards of supervisors for the same purpose. At least four agencies were legalized to do county business, and this plurality accounts for the language used in many contemporary special acts

for the relocation of county seats.     In these latter acts
it is also plainly apparent that the construction of public
buildings for the use of the county was regarded by the
people as county business prior to the adoption of the Con-
stitution.     From 1816 to 1851 thirty-nine counties were
granted special enactments for the removal of county seats,
and in every instance save one (Switzerland county, 1849)
proceedings under the removal act ended with the definite
fixing of the new place; of the thirty-eight, in twenty-three
counties, by special provision in the act, the building of
the court-house at the new site was left to the "board doing
county business," "the board of commissioners," "the board
of justices of the peace," or "board of supervisors," accord-
ing as the board doing the county business of the particular
county was called, to be accomplished under the general
laws in force at the time; and in the remaining fifteen
counties the act concluded without any mention of who
should construct, or how the public buildings should be
provided.

The confusion in the administration of county and town-
ship affairs, which had resulted from the general rule of
legislation that "any member could have what his own
people wanted" had grown so inconvenient and unsatis-
factory as to create a popular demand for a remedy.     This
is shown by the debates in the constitutional convention.
Mr. Pettit, having called attention to the deplorable state
of affairs that made it important for the citizen when he
stepped over the boundary line from one county to another,
first to inform himself as to the laws he was under, made
a strong appeal for a single system of laws that should
be uniform in their operation throughout the State.     "If
this is not done," said he, "you are just leaving undone
the very thing which, most of all others, we are sent here
to do."     "The whole oppression of our law," he continues,
"and almost the whole necessity of calling this convention,
was to do away with this local legislation."     2 Debates in

Ind. Convention, 1765-1771. At the time of these asser-
tions, county business, including the building of court-
houses, was being conducted in some counties by boards
of commissioners composed of three members selected from
different parts of the county, in others by an indefinite
number of justices of the peace, in others by three trustees,
and in others by boards of supervisors; and is it to be
believed that these various laws, and these various modes
of performing the duties required of the inhabitants of a
county or township, and which affected more of the imme-
diate and direct concerns of the citizen than any other
subject of legislation, did not contribute largely to the
unfortunate state of affairs denounced by Mr. Pettit?
From these considerations, and others that might be
brought, we come unhesitatingly to the conclusion that the
building of court-houses in the several counties of the State
was understood by the people and framers of the Consti-
tution as being county business, and was intended by the ˙
latter to be embraced within the term as employed in §22,
article 4. See *Board, etc., v. State, ex rel.,* 155 Ind. 604,
608; *Kilchel* v. *Board, etc.,* 123 Ind. 540; *Mount* v. *State,
ex rel.,* 90 Ind. 29, 46 Am. Rep. 192.

The question then arises, does the building of a court-
house lose the character of county business when made
a part of a legislative scheme for the relocation of a county
seat? The law will not permit a thing to be done by
indirection that can not be done directly. The General
Assembly is as much bound by the limitations fixed by
the Constitution as individuals. Section 22, article 4, is
an unequivocal denial of the right to pass a special or local
law regulating county or township business; and such an
act, passed in defiance of the constitutional mandate, can
have no more force as law than if passed by a board of
aldermen. We must presume in favor of legislative free-
dom, but when it is so clear as to exclude all reasonable
doubt that forbidden grounds have been entered it becomes

our imperative duty to uphold the Constitution. *State* v.
*Gerhardt,* 145 Ind. 439, 451, 33 L. R. A. 313, and cases
cited. -

It would seem unreasonable and indefensible to hold that
the General Assembly, while legislating upon a proper sub-
ject, may assume and exercise a power expressly denied
it by the Constitution, and from design or oversight, by
uniting with other subjects, pass a law which the Con-
stitution says it shall not pass. Under such a ruling every
subject interdicted by §22 may be swallowed up in other
subjects, and the section nullified. See *Board, etc.,* v. *State,
ex rel.,* 155 Ind. 604, 608.

The rule contended for that an express power carries
with it all implied powers necessary to make that which
is expressed effective, is not applicable here: (1) Because
there is no expressed power in the Constitution for legis-
lative location of county seats. It is recognized to exist
by implication, as it was the common usage before the
adoption of the present Constitution, and not denied in
that instrument. (2) Because authority to build the court-
house for a county is not necessary to the full exercise of
the power to provide the procedure for the relocation of
the county seat. The procedure for the determination of
the place for the seat of county government is one thing,
and the equipment of the place with the necessary facilities
for the county's purposes is quite a different thing.

2. Does the act undertake to regulate the building of
the court-house in Newton county? It is provided (Acts
1899, p. 210, §§2 and 10) that the successful petitioners
shall pay all costs of appraisement of the public property
at the old site, shall provide and present the county with
not less than two acres of ground at the new site upon
which to erect the court-house and jail, shall cause plans
and specifications for a new court-house to be prepared
and filed with the county auditor, and shall pay all the

costs thereof (§2), and when the foregoing conditions are complied with the board of commissioners shall order the new buildings erected according to such plans and specifications, and (§12) shall cause a special tax to be assessed and collected of the successful townships, and paid into the county treasury, in an amount equal to the appraised value of the county's property at the old site, and shall order the sale of a sufficient number of bonds to pay for the construction of the new buildings. It is also provided (§17) that if the election provided for is not carried for relocation, or if an election be not held within two years (§18), in either case, upon a petition being filed by 500 voters for the erection of new buildings at the old site it then is the imperative duty of the commissioners to grant said petition within two days after its filing, and within the next two days to take steps to procure plans and specifications for the new buildings; and further enacts that "all the duties herein imposed upon or required of the board of commissioners and the auditor shall be imperative, and the provisions hereof shall in all respects be mandatory." Here we find language in the most positive terms that a particular class of taxpayers shall provide and present the county with a site, and pay all costs of the plans and specifications of new buildings, and language just as imperative that the board of commissioners shall construct for the county the class and kind of court-house these particular citizens shall decide upon; and shall, upon the happening of an event, not only act upon a petition to build a court-house at Kentland, but shall grant it within two days of its filing, and within the next two days begin proceedings to build. The manner in which the county shall acquire the necessary grounds at the new site, how and by whom the plans and specifications for the new building shall be provided, who shall pay for them, the particular kind and class of court-house (that determined by the petitioners) that shall be constructed by the commis-

sioners, the exact way in which they shall raise the money, the definite time in which they shall act upon a petition to build, and just how they shall act and just when they shall begin, are all matters fixed in definite terms described in the law to be in all respects mandatory. It is difficult to conceive of a more arbitrary mode of constructing a county building; a mode in which the commissioners, legally charged with that duty, have not the slightest discretion; and by which the legislature assumes to provide by inexorable rule the time, the means, and manner of performance of every detail. This seems to us to be a drastic regulation of the building of a court-house, and hence an attempt to regulate county business. We must therefore hold that these provisions must fail for want of constitutional authority to enact them.

We are asked to sustain the relocation branch of the statute if it is found that the other branch must fail. We recognize our right to do so if the two subjects may be separated so as to leave the provisions concerning relocation a complete act within itself, and of a character to warrant the belief that the legislature would have passed it, with the knowledge that the provisions concerning the building of a court-house would be held invalid. But if the provisions of the act are so mutually connected with and dependent upon each other as conditions and considerations for each other as to induce the belief that the legislature intended them as a whole, and would not have passed one part without the other, then the whole must fail. *State, ex rel.,* v. *Fox,* 158 Ind. 126, 140, 56 L. R. A. 893; *State, ex rel.,* v. *Denny,* 118 Ind. 449, 479, 4 L. R. A. 65, and cases cited. It is perfectly plain that two principal objects go hand in hand throughout the entire act, and appear in almost every section, namely, the final settlement of the location controversy and the construction of good, substantial public buildings as a means of assuring permanency. It will be observed on the one hand that to encourage and

influence votes for removal the petitioners shall relieve the other taxpayers of the county from the cost of new grounds, plans, and specifications for the new buildings, and the successful township is to contribute to the county treasury, over and above its share of the general tax, a sum equal to the appraised value of the county's property at Kentland; that is to say, if the other voting taxpayers of the county will join the petitioners in voting a relocation, the petitioners will assume as their own, not only all the cost of establishing the county seat at the new place over what new buildings would cost at the old seat, but will buy for cash all the county's property at Kentland, and authorize the commissioners thereafter to present such property to the latter town (§13), as compensation for its loss. On the other hand, to induce the petitioners to assume extra burdens, they are to have the exclusive right to determine for the county the kind and class of court-house that shall be constructed, not to exceed in cost eight-tenths of one per cent. of the taxable property of the county, and the board of commissioners are required to construct such new buildings in accordance with said plans. Remove from the act all these conditions and mutual considerations for favorable votes on one side and for the assumption of increased burdens on the other, and we perceive not a single thing left in the act that is not supplied by the general law for the relocation of county seats. See §5588a et seq. Burns 1901. It does not, therefore, seem probable, because there is no reason for it, that the legislature would have passed a relocation statute without special provisions regulating the mode of acquiring new grounds, disposing of the old, and promoting the construction of new public buildings. The entire act must, therefore, be held unconstitutional.

Judgment reversed, with instructions to sustain the demurrer to the complaint and alternative writ.