## Loganton Borough Poor District et al. v. Clinton County et al.

*Ellis L. Orvis* and *Abraham H. Lipez,* for plaintiffs.

*F. C. Gross,* county solicitor, and *Henry Hipple,* for defendants.

290

BAIRD, P. J., May 27, 1931.—The bill in this case prays, *inter alia*, that the defendants, J. L. Rachau, Jacob F. Wise and M. C. Coleman, as Commissioners of Clinton County, and in each and every other capacity they have assumed to act, be restrained and enjoined from accepting any contracts, either general or special, involving the proposed erection and construction of a county home (for the poor) at Hyner Bridge, and be restrained and enjoined from spending any money belonging to Clinton County for materials and supplies for the purpose of maintaining and constructing said county home.

When the bill was presented, we fixed a time for a hearing to determine whether a preliminary injunction should be granted.

At the time appointed testimony was taken and arguments of counsel heard.

The plaintiffs contend that the Act of April 7, 1927, P. L. 148, entitled "An act to amend section 300 of the act approved the fourteenth day of May, 1925 (Pamphlet Laws seven hundred and sixty-two), entitled 'An Act concerning poor relief and the creation and government of poor districts and the administration of the same in all counties of the Commonwealth, except in counties of the first and second class; and revising, amending, consolidating and changing the law relating thereto,' constituting the county commissioners in certain districts as directors of the poor," and the Act of April 11, 1929, P. L. 508, amending sections 200 and 202 of said Act of May 14, 1925, P. L. 762, as amended, "by removing the exemption of the County of Clinton," etc., "thereby creating a county poor district administered by county commissioners," under which they assume the county commissioners are acting in the premises, are unconstitutional because local or special in their nature and, therefore, forbidden by article three, section seven, of the Constitution of Pennsylvania. For the purposes of this opinion, we shall assume that said amendatory Acts of 1927 and 1929 are local or special in their nature.

The plaintiffs also contend that the Act of May 24, 1921, P. L. 1081, entitled "An Act providing for county poor districts in counties of the seventh class [to which class the County of Clinton belongs]; providing for their management, direction, and control by the county commissioners; defining their powers and duties; imposing certain duties upon the county treasurer and county controller or county auditors; abolishing the present poor districts, and transferring their property," was repealed by the said Act of May 14, 1925, *supra*. Under said Act of 1921, an election was held in November, 1928, to determine whether the commissioners of the county should establish a county poor district, and the election resulted in favor of the proposition, but owing to certain alleged procedural omissions, it is contended by the plaintiffs that the project failed of consummation, even though the act under which the election was held had not been repealed. If we were not so sure that the Acts of 1927 and 1929, *supra*, are not prohibited legislation, the questions relating to the Act of 1921 would deserve careful consideration, but as it is, we do not deem it necessary to discuss them.

Another contention of the plaintiffs is that the site selected by the county commissioners for a county poor home is not suitable for the purpose, and that in selecting it the commissioners abused their discretion. This and the question of the constitutionality of the Acts of 1927 and 1929 we shall proceed to consider, giving first place to the latter.

First, however, it is to be noted that the constitutionality of the Act of 1925, parent of the two amendatory Acts of 1927 and 1929, is not questioned in this proceeding, and that it has been held to be constitutional in Com. *v.* Reese, 293 Pa. 398.

Straub *v.* Pittsburgh et al., 138 Pa. 356, so much relied upon by counsel for plaintiffs as authority for the proposition, that, notwithstanding the omission therefrom of poor districts, the seventh section of article three of the Constitution does prohibit local or special legislation relating to such districts, was a bill to enjoin the City of Pittsburgh, the Mayor and the Chief of the Department of Charities from making a contemplated conveyance of a tract of land known as the city poor farm, the legal title to which was vested in the Guardians for the Relief and Employment of the Poor of the City of Pittsburgh, a corporation created by the Act of March 6, 1847, P. L. 233. The decision involved the applicability of an act approved April 28, 1887, P. L. 75, entitled "An Act to authorize the courts of common pleas to decree the sale of real estate, held for poor purposes, in the several counties, boroughs, townships and poor districts in this Commonwealth, and the reinvestment of the proceeds thereof," by the first section of which it is provided that "The courts of common pleas of the several counties of this Commonwealth shall have jurisdiction and are hereby authorized to decree a public or private sale of any poor house property, or real estate held for the relief and employment of the poor in any county, city, borough, township or poor district, at such times and in such parts or parcels and upon such terms as, in the opinion of any such court, may be considered most advantageous." The second section provides for the petition of the overseers, directors or managers, and that the sale shall only be ordered "after a full and careful investigation by the court," and provides for the investment of the proceeds by direction of the court. The third section of the act repeals all acts inconsistent therewith. Following · a reference to this Act of April 28, 1887, the lower court (Judge Ewing) propounds the question: "Does this act become a part of the law governing the sale and purchase of property for poor purposes belonging to the city of Pittsburgh, *i. e.,* cities of the second class?" and then goes on to say: "This and the question of the constitutionality of the Acts of May 25, 1887 [P. L. 263], and June 14, 1887 [P. L. 395], in our opinion, raise the only doubtful questions in the case."

The Act of May 25, 1887, P. L. 263, is entitled "An Act relating to the acquisition, purchase and sale of real estate by the boards of guardians for the relief and employment of the poor in cities of the second class," and provides in its first section that such boards are authorized and empowered, in the names of such cities, to sell and convey farms or sites, or any part or parts of the same, then owned or occupied for poor farm purposes, and to make, execute and deliver a deed or deeds of conveyance to the party or parties purchasing the same, vesting title in such purchasers. The second, third and fourth sections of this act confer other powers on the guardians.

Section five provides that the acts authorized by the preceding sections shall be submitted to and approved by councils, and section six repeals all laws or parts of laws conflicting therewith.

The Act of June 14, 1887, *supra,* is entitled "An Act in relation to the government of cities of the second class," and by its fourth section provides that "There shall be the following executive departments, the heads of which shall be chosen by city councils: . . . III. Department of Charities;" by its twelfth section, that the councils thereof "Shall have full power and authority to provide, by ordinance, for the relief and employment of the poor of said cities, and for that purpose shall have power and authority to sell and purchase real estate and improvements, and erect such improvements as may be deemed necessary for the proper care and maintenance of said poor;" by its seventeenth section, that "to the department of charities shall be confided the care,

management, administration and supervision of the charities, almshouses and hospitals, and all similar institutions, the expenses of which are paid out of the city treasury;" and by its last section, all laws or parts of law supplied by or inconsistent therewith are repealed.

As stated by Judge Ewing, "By Act of March 22, 1877, P. L. 16, it [the Board of Guardians for the Relief and Employment of the Poor of the City of Pittsburgh] was declared to be a department of the city government," and he adds: "It was so without such a legislative declaration," and upon the latter proposition he builds his argument that although not mentioned in the seventh section of the third article of the Constitution, local legislation for poor districts is prohibited thereby, saying (page 361) : "It is true that the seventh section of the third article of the constitution does not in precise words prohibit local legislation for poor districts, as it does for school districts, and for this very good reason: the care of the poor has always been considered a municipal function and 'affairs of counties, cities, townships, wards and boroughs,' for which local laws are prohibited in the second paragraph of § 7, while the uniform rule has been to treat schools and school districts as something separate and independent of the ordinary municipal governments."

In this case of Straub v. Pittsburgh, an ordinance had been passed by city councils and approved by the mayor directing the sale of the "city farms." The plaintiff alleging that the legal title to said farm was vested in the Guardians for the Relief and Employment of the Poor of the City of Pittsburgh, and that the City of Pittsburgh, illegally, and without authority of law, claiming to be the owner thereof, had by ordinance ordained and enacted that the same should be sold and conveyed; that the Chief of the Department of Charities had advertised said real estate for sale, and after opening bids, had entered into a written contract on behalf of the said city to sell and convey the same to one Milton I. Baird, and that the defendants were about to execute and deliver a deed in fee simple for the said lands, to him or to the Carnegie-Phipps Company, Limited, his assignee, prayed, *inter alia*, for an injunction restraining said contemplated conveyance.

It is apparent that the city was proceeding under the Act of June 14, 1887, *supra*, by the twelfth section of which its councils were given full power to provide, by ordinance, for the relief and employment of the poor of the city, and for that purpose to sell and purchase real estate and improvements, etc., as under the prior Acts of April 28, 1887, and May 25, 1887, *supra*, other inconsistent provisions were made for the sale of poor property, the Act of April 28, 1887, authorizing such sale under decree of the court of common pleas upon petition of the overseers, or poor directors, or managers for the employment and relief of the poor of any county, city, borough, township, or poor district, and the Act of May 25, 1887, authorizing the boards of guardians for the relief and employment of the poor in cities of the second class to sell and convey farms or sites then owned or occupied for poor farm purposes, subject to the approval of city councils.

If the Act of June 14, 1887, which, as before stated, is entitled "An Act in relation to the government of cities of the second class," is constitutional, it superseded the prior acts of that year making other provisions for the sale of poor property. Judge Ewing held that it is constitutional on the ground of the legislative power to classify cities (and to enact appropriate laws for the government of each class) and by formal decree denied the relief prayed for. For this reason and because the care of the poor had been made a function of cities of the second class (albeit contrary to the general course of poor legislation) by the Act of March 22, 1877, there was no occasion for him to

decide whether or not poor districts are included in article three, section seven of the Constitution, forbidding legislation, "regulating the affairs of counties, cities, townships, wards, boroughs or school districts." This question was not adjudicated by him because not involved, and when the Supreme Court, in a per curiam opinion, without any discussion whatever, affirmed "the decree of the court below" it did no more than subscribe to that decree of which the remarks of Judge Ewing, relative to the question of local or special legislation for poor districts, formed no part. This legislation—the Act of June 14, 1887—related "to the government of cities of the second class," of which the care of the poor had been made an incident by the Act of 1877, and not to poor districts. No poor district, as such, in the state was affected thereby.

Another case in which the application of section seven, article three of the Constitution was discussed, but not decided, is Jenks Township Poor District v. Sheffield Township Poor District, 135 Pa. 400. However, in that case Mr. Justice Clark, who, as Judge Ewing says, was a distinguished member of the constitutional convention, said (page 409) : "Moreover, it would appear that the limitations upon the powers of the legislature as to local or special legislation do not extend to the regulation of affairs of poor districts. The affairs of townships do not of necessity include the affairs of either the school or poor districts embraced within the same boundaries. The provision of the constitution, Article III, § 7, is that 'the general assembly shall not pass any local or special law,' etc., 'regulating the affairs of counties, cities, townships, wards, boroughs, or school districts.' It is a very significant fact that, whilst school districts are expressly included within the restriction, poor districts are plainly omitted. . . . The convention, being conversant with the manifold forms in which the public charity was dispensed,—in county poor houses and in district poor houses organized under both general and special laws, in hospitals and homes supported by contributions both public and private, and through the ordinary agency of the overseers or directors of the poor—may have deemed it unwise to interrupt the course of legislation on this subject, or to restrict the relief and employment of the poor to any one uniform or general system for the whole state, preferring rather that the hand of charity might be freely extended in any form which the legislature from time to time might provide."

Although this be dictum, it is nevertheless entitled to the greatest respect because of its source, and, apart from its source, because of its rational appeal. See, also, opinion of Judge Linn in Com. v. Woodward, 95 Pa. Superior Ct. 423, 429, where he asserts that poor districts are not subject to the prohibition against local or special legislation, and cites Jenks Township Poor District v. Sheffield Township Poor District, supra.

If by "municipal functions" or "affairs" Judge Ewing meant that the care of the poor had always been the function or affairs of counties, cities, townships, wards and boroughs, as such, he was mistaken, as is clearly shown by Judge Koch in Tosh v. Schlottman, 2 D. & C. 256. In an historical review of poor legislation in this Commonwealth, he shows that ever since the passage of the Act of January 12, 1705, chapter 154, 2 Statutes at Large of Pennsylvania, 251, we have had poor districts and overseers of the poor; that by the second section of "An Act for amending the laws relating to the Poor," passed August 19, 1749, 5 Statutes at Large of Pennsylvania, 79, it was provided: "That the said overseers of the poor for the several townships, city and boroughs aforesaid for the time being respectively shall forever hereafter in name and in fact be and they are hereby declared to be bodies politic and corporate in law to all intents and purposes, and shall have perpetual succession,

and by the name of overseers of the poor of the said respective townships, city or boroughs may sue and be sued and plead or be impleaded in all courts of judicature within this province, and by that name shall and may purchase, take or receive any lands, tenements or hereditaments, not exceeding the yearly value of five hundred pounds, and also any goods or chattels whatsoever, to and for the use and benefit of the poor of each of said townships, city or boroughs respectively of the gift, alienation or devise of any person or persons whomsoever, to hold to them the said overseers and their successors in the said trust for the use of the said poor respectively forever;" and that other acts were passed until March 9, 1771, when the General Assembly passed a general act of great length, entitled "An Act for the relief of the Poor," 1 Sm. Laws, 332. (By the sixteenth section of the latter act, the provisions of the Act of August 19, 1749, above quoted, were substantially reënacted). Judge Koch also shows that in the course of time special legislation was passed enlarging poor districts by making whole counties into single districts (citing instances) ; that by a special act approved March 25, 1862, P. L. 178, parts of two counties (Luzerne and Carbon) were taken and erected into one district, by the name of the Middle Coal Field Poor District; that since the passage of that act the Borough of Hazleton has become a city, but still remains a part of the Middle Coal Field Poor District, which has been enlarged so as to include other municipal divisions in Luzerne and Carbon Counties; and that this district has been the subject of special legislation since 1874, the last act relating thereto being that of May 25, 1917, P. L. 305.

Continuing his review of the poor laws, Judge Koch refers to the Act of June 4, 1879, P. L. 78, which he styles the most general legislation since the adoption of the Constitution of 1874, and after referring to some of its provisions, goes on to say: "Hence, it is seen that poor districts were of great number and variety all over this State at the time when the constitutional convention framed the so-called Constitution of 1874, and the Act of 1879 added to the variety. Of course, all the members of that intelligent convention knew that the State was filled with a great variety of 'poor districts,' and when they framed article III (Legislation), they did it with such intelligent care and circumspection as not to prevent the people in the various localities of the State from caring for the poor as they had always cared for them in the past or might wish to care for them in the future. It is, therefore, my belief and opinion that the constitutional convention studiously and designedly omitted from the inhibitory clauses against local or special legislation any reference whatever to poor districts."

In the light of the history of "poor" laws and "poor" districts in Pennsylvania, it is difficult to understand how anyone can say that the care of the poor had always been an affair "of counties, cities, boroughs, townships, wards and boroughs," while the uniform rule had been to treat schools and school districts as something separate and independent of the ordinary municipal governments. As stated by Mr. Justice Schaffer in Com. v. Reese, *supra*, at the time of the passage of the Act of 1925 there were 583 poor districts in the state, and forty-four of them were county unit districts. Surely poor districts at the time of the adoption of the Constitution were as well established in the laws of the state as were school districts.

To say that the care of the poor is a municipal function is without point. A poor district is as much a municipality as is a county or township. None of them is a municipality in a strict technical sense: Chester County v. Brower, 117 Pa. 647, 655; Bucher v. Northumberland County, 209 Pa. 618; Union Township v. Gibboney & Nelson, 94 Pa. 534, 537; St. David's Church v.

Sayen, 244 Pa. 300; Trevorton Water Supply Co. *v.* Zerbe Township, 259 Pa. 31; Melvin *v.* Summerville, 210 Pa. 41. All of them are what are known as quasi-corporations or quasi-municipal corporations. They (counties and county poor districts) are each regarded as separate entities, with separate powers and duties fixed by statute: Tucker's Appeal, 271 Pa. 462, 463. See, also, Com. *v.* Bowditch, 217 Pa. 527.

Stress is laid by counsel for plaintiffs on the word "affairs" in the prohibitory clause of the Constitution under consideration, but however broad its significance, it cannot be made to cover anything pertaining to poor districts, which are not mentioned in the clause, without substantially adding thereto, and this is not a judicial privilege. "In construing . . . the Constitution we are not at liberty . . . to supply words omitted, in order to work out a thought which the people themselves had the opportunity to give expression to had they so desired:" Com. *v.* McAfee, 232 Pa. 36, 49; Com. *v.* Samuel, 238 Pa. 155, 157-158.

We have carefully examined the Indiana and New Mexico cases cited by plaintiffs' counsel (Board of Commissioners of Newton County *v.* State, 161 Ind. 616, 69 N. E. 442, and Territory *v.* Gutierrez, 12 N. M. 254, 78 Pac. 139), and do not find anything therein bearing on the proper construction of that clause of our Constitution which prohibits local or special legislation regulating the affairs of counties, etc. The Indiana case has to do entirely with the erection of a county courthouse, and any reference made to the care of the poor is merely incidental. Enough appears by the report of that case, however, to show that in Indiana there are no poor districts; that the state is divided into "counties, townships, cities and towns as governmental agencies," and that each subdivision has conferred upon it certain powers, rights and duties of a local character, among which is the care of the poor. Clearly, under such a scheme or frame of government no question could arise about the care of the poor being the business or affair of the particular agency to which it had been delegated. We do not have access to the New Mexico case, but the excerpt therefrom to which our attention has been called is merely a discussion of the word "business" as contrasted with the word "affairs." We have already considered the word "affairs" in connection with its use in section seven, article three, of the Constitution of Pennsylvania.

In any discussion of the constitutionality of an act of assembly, it must be kept in mind that all of the presumptions are in its favor. "It comes to us with the seal of approval of two of the coördinate departments of the government. To doubt is to decide in favor of its constitutionality. It is only in a clear case that we are justified in declaring an act to be unconstitutional:" Craig *v.* First Presbyterian Church, 88 Pa. 42, 46. An act cannot be declared unconstitutional unless its violation of the Constitution is so manifest as to leave no reasonable doubt: Hilbish *v.* Catherman, 64 Pa. 154. Nothing but a clear usurpation of a power prohibited will justify pronouncing an act of the legislature void: Penna. R. R. Co. *v.* Riblet, 66 Pa. 164; Busser *v.* Snyder, 282 Pa. 440, 449. The burden is on him who alleges the invalidity of an act to show it. He must show a clear, palpable and plain violation of the Constitution so plainly as to leave no doubt: Mayer *v.* Franklin County, 85 Pa. Superior Ct. 463, 467.

And now as to the site of the building proposed to be erected by the county commissioners for the purpose of taking care of the poor of the county; the 216th section of the Act of May 14, 1925, *supra,* authorizes the directors of the poor (county commissioners ex officio) to purchase or acquire by eminent domain and take title in the name of the district such lands as to them may

appear most eligible and suitable for the purpose of the erection thereon of proper, adequate and suitable buildings for the employment and support of the poor in the district, and provides that any such purchase or acquisition shall be only with the approval of the court of common pleas. Such approval had been obtained by the county commissioners before there was any public agitation concerning the site or any other question involved in this case. Every reasonable objection to the site selected by the county commissioners has been met and overcome by a preponderance of the testimony. The village of Hyner, with a church and two general stores, is within a mile or a mile and a half of the proposed site. Hyner is a station on the Pennsylvania Railroad, which furnishes transportation facilities, both freight and passenger, for the community. The site is located on an improved highway between Lock Haven and Renovo, the two principal towns in the county—about seven or eight miles east of Renovo and about eighteen miles west of Lock Haven. In addition to railroad facilities, there is bus service between Renovo and Hyner and prospective bus service covering the entire distance between Renovo and Lock Haven. Trucks or wagons from Renovo, North Bend and Lock Haven, delivering bread, meat and vegetables, pass the proposed site daily. There is plenty of good water on the premises. The soil is not poor, but is river-bottom land, a sand loam, which in the past has produced good crops and may be made to produce good crops in the future. The Renovo Light, Heat and Power Company has already extended its electric lines to a point within half a mile or so of the site selected and is willing to extend them the remainder of the way whenever its service may be required. The objections that there are no physicians nearer the selected site than Renovo, and that the county commissioners, by reason of the distance of their office (eighteen miles) therefrom, would be prevented from giving necessary personal attention and oversight to the conduct and administration of the county home, are of little weight in view of the quick and easy transportation afforded by good roads and automobiles. If these latter objections were tenable, we know of no county home to which they would not apply with greater or less force. It seems to be the universal practice to locate such institutions in country districts, away from the county seat and other densely populated centers.

Considered in its aspect most favorable to the contention of the plaintiffs, the most that can be claimed for the testimony relative to the site selected by the county commissioners is that it proves their action in this regard to have been unwise. With such claim, however, we cannot agree.

To the county commissioners was committed in the first instance the authority to purchase lands for the purpose of erecting thereon suitable buildings for the employment and support of the poor. The selection of such lands necessarily involved the exercise of their discretion, and it is a well-established principle of law that where a body is clothed with deliberative or discretionary powers, and has exercised those powers according to its discretion, the courts are powerless to interfere, except where the discretion has not been exercised in good faith or has been abused. No abuse of discretion has been shown, and no attack has been made on the good faith of the commissioners. When the contention is that the proposed action is unwise, no matter by what concensus of opinion it is shown, the law will refer it to mistaken judgment, over which it has no supervision: Lamb v. Redding, 234 Pa. 481, 484; Gemmell v. Fox, 241 Pa. 146, 150. Under such circumstances, it is not sufficient to show that the proposed action is unwise. It must appear that it is not discretion that is being exercised, but arbitrary will and caprice; other-

wise the courts will refer the action complained of to a mistaken judgment, and will refuse to interfere with it: Robb v. Stone, 296 Pa. 482. Executive officers are clothed with the responsibility of originating and executing plans for the public good; the presumption is that their acts are on such consideration and their discretion reached in a legal way after an investigation. When their actions are challenged, the burden of showing to the contrary rests on those asserting it, and it is a heavy burden; courts can and will interfere only when it is made apparent this discretion has been abused: Wilson v. New Castle City, 301 Pa. 358, 365. Even though we must share with the county commissioners the responsibility for the site selected, there is nothing in either the evidence or the law to cause us to withdraw our approval heretofore given.

Now, May 27, 1931, preliminary injunction refused.